**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| EDGEWATER MEDICAL CENTER | ) | Chapter 11 |
| | ) | Case No. 02 B 07378 |
| Debtor. | ) | Honorable Bruce W. Black |
| | ) | |
| EDGEWATER MEDICAL CENTER, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Proceeding No. 04 A 2327 |
| | ) | |
| v. | ) | |
| | ) | |
| PETER G. ROGAN, BRADDOCK | ) | |
| MANAGEMENT, L.P. a California limited | ) | |
| Partnership, BAINBRIDGE MANAGEMENT, | ) | |
| LP, an Illinois limited partnership, and | ) | |
| BAINBRIDGE MANAGEMENT, INC., an | ) | |
| Illinois corporation, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF EDGEWATER MEDICAL CENTER'S REPLY MEMORANDUM IN
FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY
JUDGMENT ON FORFEITURE OF COMPENSATION,
ATTORNEYS' FEES AND PREJUDGMENT INTEREST**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ............................................................................... iii

I.    PLAINTIFF IS NOT LIMITED TO CONTRACT REMEDIES. ..................................... 1

      A.    Defendants' Argument that EMC's Breach of Fiduciary Duty Claim
            Should be Dismissed is Untimely and Precluded by the Law of the Case. ............ 1

      B.    The Economic Loss Doctrine Does Not Apply. ....................................... 3

            1.    The Economic Loss Doctrine Bars Tort Claims, Not Breach of
                  Fiduciary Duty Claims. ............................................................ 3

            2.    Fiduciary Duty Claims Are Not Barred By the Economic Loss
                  Doctrine Even Where the Duty Arises From Contractual
                  Obligations. ......................................................................... 5

II.   DEFENDANTS' WILLFUL AND DELIBERATE BREACH OF FIDUCIARY
      DUTY REQUIRES COMPLETE FORFEITURE OF ALL COMPENSATION
      PAID TO DEFENDANTS DURING THE PERIOD IN WHICH THEY USED
      EMC AS A VEHICLE TO COMMIT MEDICARE FRAUD........................................... 8

      A.    A Willful and Deliberate Breach of Fiduciary Duty Requires Complete
            Forfeiture....................................................................................... 8

      B.    Regardless of Whether Complete Forfeiture is Required or Discretionary,
            the Court Should Order Complete Forfeiture Based on the Willful and
            Deliberate Nature of Defendants' Breach of Fiduciary Duty. ........................ 9

            1.    Defendants Do Not Rebut Any of the Arguments in EMC's
                  Opening Brief Demonstrating the Willful and Deliberate Nature of
                  Defendants' Breach.................................................................. 10

            2.    Defendants' Arguments Against Complete Forfeiture Are
                  Unavailing........................................................................... 11

      C.    Defendants Should Be Ordered to Forfeit All Compensation Received
            During the Period of Their Willful and Deliberate Breach of Fiduciary
            Duty, Including Administrative Manager Reimbursements and Exclusive
            Corporate Service Fees ...................................................................... 18

            1.    Defendants Should Be Required to Forfeit All Administrative
                  Manager Reimbursements Because Such Payments Were a Form
                  of Compensation and Because Courts Have Held that
                  Reimbursable Expenses Are Subject to Forfeiture. ....................... 19

i

2.      The Management Agreements Required EMC to Retain
Defendants for Corporate Services and These Fees Were Paid
During a Time When Defendants Were in Willful and Deliberate
Breach of Their Fiduciary Duty. ............................................................... 21

D.      There Is No Disputed Issue of Fact Regarding the Amount of
Compensation EMC Paid to Defendants During the Period of Their
Breach. ..................................................................................................... 22

III.    EMC IS ENTITLED TO INDEMNIFICATION ............................................. 24

A.      The General Rules For Calculating Contract Damages Do Not Apply. ............... 24

B.      EMC Is Not Limited To Losses "Caused" By Defendants' Breach .................... 26

C.      EMC Is Entitled To Recover its Attorneys' Fees and Expenses ........................ 27

D.      Edgewater Is Entitled To Prejudgment Interest .................................................... 31

IV.     SUMMARY JUDGMENT SHOULD BE ENTERED AGAINST BRADDOCK
L.P. FOR THE ADDITIONAL REASON THAT IT FAILED TO RESPOND TO
EMC'S MOTION. ............................................................................................... 32

A.      Braddock Was Obligated to Respond to EMC's Summary Judgment
Motion. ...................................................................................................... 32

B.      By Failing to Respond to EMC's Motion, Braddock L.P. Has Effectively
Admitted that There Are No Genuine Issues of Material Fact Preventing
Summary Judgment. .............................................................................. 33

C.      Alternatively, At a Minimum, Braddock L.P. Is Bound to the Same Extent
as Its General Partner, Bainbridge Inc. ................................................. 33

CONCLUSION ................................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*Aaron Transfer & Storage v. Bekins Van Lines*, 2002 U.S. Dist. LEXIS 21789
(N.D. Ill. Nov. 12, 2002)...................................................................................... 4, 5, 7

*ABC Trans Nat'l Transp., Inc. v. Aeronautics Forwarders, Inc.*, 413 N.E.2d 1299
(Ill. App. Ct. 1980).................................................................................. 9, 11, 14, 21

*All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862 (7th Cir. 1999) ........................................ 4

*American United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921 (7th Cir. 2003)................ 4

*Archer Daniels Midland Co. v. Whitacre*, 60 F. Supp. 2d 819 (C.D. Ill. 1999) ............................ 8

*Arendt v. Vetta Sports, Inc.*, 99 F.3d 231 (7th Cir. 1996) ........................................................ 2, 10

*Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801 (Ill. 2005)........................................... 25

*Avitia v. Metro. Club*, 49 F.3d 1219 (7th Cir. 1995)...................................................................... 2

*Balcor Real Estate Holdings v. Walentas-Phoenix Corp.*, 73 F.3d. 153 (7th Cir. 1996) ............. 29

*Bank One, N.A. v. Borse*, 351 Ill. App. 3d 482 (Ill. App. Ct. 2004) ............................................... 4

*Berthold Types, Ltd. v. Adobe Sys., Inc.*, 186 F. Supp. 2d 834 (N.D. Ill. 2002) .......................... 29

*Black v. Hollinger Int'l, Inc.*, 2004 WL 2496590 (N.D. Ill. 2004)................................................. 8

*Blakely v. Brach & Brock Confections, Inc.*, 181 F. Supp. 2d 943 (N.D. Ill. 2002)...................... 2

*Blocklingfer v. Schlegel*, 374 N.E.2d 491 (Ill. App. Ct. 1978) ...................................................... 9

*Boss v. Commonwealth Edison Co.*, 1995 U.S. Dist. LEXIS 13798 (N.D. Ill. Sept. 20, 1995) ... 30

*Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999) ............................................................................. 20

*Buxton v. Equifax Credit Info. Servs., Inc.*, 2003 WL 22844245 (N.D. Ill. Dec. 1, 2003) ........... 10

*Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry*, 50 F.3d 388 (7th Cir. 1995).................. 32

*Cacique, Inc. v. V&V Supremo Foods, Inc.*, 2004 WL 2222270 (N.D. Ill. Sept. 30, 2004)......... 15

*Calderon v. Southwestern Bell Mobile Sys.*, 2003 U.S. Dist. LEXIS 18257
(N.D. Ill. Oct. 10, 2003)............................................................................................ 3

*Choi v. Chase Manhattan Mortg. Co.*, 63 F. Supp. 2d 874 (N.D. Ill. 1999) .............................. 5, 6

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988) ................................................ 2

*Congregation of the Passion v. Touche & Ross Co.*, 636 N.E.2d 503 (Ill. 1994) ...................... 4, 6

*Continental Bank, N.A. v. Meyer*, 10 F.3d 1293 (7th Cir. 1993) ................................................... 32

*County of Cook v. Lynch*, 620 F. Supp. 1256 (N.D. Ill. 1985) ..................................................... 17

*Cumis Ins. Soc'y v. Peters*, 983 F. Supp. 787 (N.D. Ill. 1997) ....................................................... 7

*Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907 (7th Cir. 1994) ................................ 2

*Dowd & Dowd, Ltd. v. Gleason*, 816 N.E.2d 754 (Ill. App. Ct. 2004) ......................................... 16

*Enstar Group, Inc. v. Grassgreen*, 812 F. Supp 1562 (M.D. Ala. 1993) ..................................... 16

*FDIC v. Miller*, 781 F. Supp. 1271 (N.D. Ill. 1991) .................................................................... 5, 6

*Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 176 Ill. 2d 160 (Ill. 1997) .................................. 4

*First Bank & Trust Co. of Ill.  v. Vill. of Orland Hills*, 338 Ill. App. 3d 35
    (Ill. App. Ct. 2003) ................................................................................................................... 25

*Flynn v. Sandahl*, 58 F.3d 283 (7th Cir. 1995) ............................................................................. 33

*Forsythe v. Polsky*, 1993 U.S. Dist. LEXIS 3125 (N.D. Ill. Mar. 11, 1993) ................................. 5

*Frey v. Fraser Yachts*, 29 F.3d 1153 (7th Cir. 1994) .................................................................... 12

*FTC v. Febre*, 1996 U.S. Dist. LEXIS 14297 (N.D. Ill. Sept. 27, 1996) ....................................... 9

*Fucarino v. Thornton Oil Corp.*, 1999 WL 691820 (N.D. Ill. Aug. 23, 1999) ............................ 14

*Grace v. E.J. Kozin Co.*, 538 F.2d 170 (7th  Cir. 1976) ................................................................ 16

*Grant v. Coken Co.*, 2004 U.S. Dist. LEXIS 18421 (N.D. Ill. 2004) ........................................... 33

*Greyhound Fin. Corp. v. TSM Fin. Group, Inc.,* 1993 U.S. Dist. LEXIS 10873
    (N.D. Ill. Aug. 4, 1993) ............................................................................................................... 9

*Ha-Lo Indus. v. Kelly*, 2004 Bankr. LEXIS 8 (Bankr. N.D. Ill. Jan. 5, 2004) ............................... 4

*Hill v. Names & Addresses, Inc.*, 571 N.E.2d 1085 (Ill. App. Ct. 1991) ...................................... 12

*Hufford v. Balk*, 113 Ill. 2d 168 (Ill. 1986) ................................................................ 26

*Illinois Constructors Corp. v. Morency & Assocs., Inc.*, 802 F. Supp. 185 (N.D. Ill. 1992) ......... 7

*In re Allied Physicians Group, P.A.*, 2004 WL 2965001 (N.D. Tex. Dec. 15, 2004) ........... 20, 21

*In re Hadleigh D. Hyde Trust*, 348 N.W.2d 802 (S.D. 1990) ...................................................... 16

*In re Marriage of Pagano*, 607 N.E.2d 1242 (1992) ................................................................... 8

*Inter-Asset Finanz Ag, v. Refco, Inc.*, 1993 U.S. Dist. LEXIS 8418 (N.D. Ill. June 21, 1993) ...... 5

*Kalal v. Goldblatt Brothers, Inc.*, 368 N.E.2d 671 (Ill. App. Ct. 1977) ...................................... 25

*Kingsford Fastener, Inc. v. Hitachi Koki U.S.A., Ltd.*, 2002 U.S. Dist. LEXIS 8657
  (N.D. Ill. May 15, 2002) ........................................................................................................ 7

*Kinzer v. Chicago*, 128 Ill. 2d 437 (Ill. 1989) .............................................................................. 4

*Kirkland & Ellis v. CMI Corp.*, 1996 U.S. Dist LEXIS 14346 (N.D. Ill. Sept. 29, 1996) ............. 3

*Knoll Pharm. Co. of Hartford v. Auto. Ins. Co.*, 210 F. Supp. 2d 1017 (N.D. Ill. 2002) ............ 30

*Kocik v. USF Holland, Inc.*, 2005 WL 442369 (N.D. Ill. Feb. 22, 2005) ..................................... 15

*Kurtz v. Solomon*, 656 N.E.2d 184 (Ill. App. Ct. 1995) ................................................................ 7

*Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195 (7th Cir. 1999) ............................... 2, 6

*Letsos v. Century 21-New West Realty*, 675 N.E.2d 217 (Ill. App. Ct. 1996) .............................. 7

*Lewis X. Cohen Ins. Trust v. Stern*, 696 N.E.2d 743 (Ill. App. Ct. 1998) ................................... 28

*LID Assocs. v. Dolan*, 756 N.E.2d 866, 886 (Ill. App. Ct. 2001) ................................................. 9

*Lippert Mktg., Ltd. v. Kingwood Ceramics, Inc.*, 1996 WL 648705
  (N.D. Ill. Oct. 31, 1996) ....................................................................................................... 12

*Majumdar v. Lurie*, 660 N.E.2d 915 (Ill. App. Ct. 1995) ............................................................. 3

*McLaughlin v. Chicago Transit Auth.*, 243 F. Supp. 2d 778 (N.D. Ill. 2003) ....................... 11, 12

*Medcom Holding Co. v. Baxter Travenol Labs.*, Inc., 200 F.3d 518 (7th Cir. 1999) ............ 29, 30

*Metrick v. Chatz*, 639 N.E.2d 198 (Ill. App. Ct. 1994) ................................................................. 3

*Michael v. St. Joseph County*, 259 F.3d 842 (7th Cir. 2001).........................................................32

*Monarch Gems v. Malca-Amit USA, L.L.C.*, 2005 U.S. Dist. LEXIS 9971
 (N.D. Ill. May 4, 2005) .............................................................................................................4

*Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443 (Ill. 1982) .......................................3, 4, 7

*Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601 (7th Cir. 2001) ...........................4

*Nilsson v. NBD Bank of Ill.,* 731 N.E.2d 774 (Ill. App. Ct. 1999)...............................................25

*Payne v. Churchich*, 161 F.3d 1030 (7th Cir. 1998)........................................................................2

*Pearson v. Edgar*, 1999 U.S. Dist. LEXIS 4388 (N.D. Ill. Mar. 22, 1999)................................2, 3

*Peñasquitos, Inc. v. Superior Ct.*, 53 Cal. 3d 1180 (Cal. 1991)...................................................32

*Peoples v. United States*, 403 F.3d 844 (7th Cir. 2005)..................................................................2

*Ploog v. Homeside Lending, Inc.*, 209 F. Supp. 2d 863 (N.D. Ill. 2002).......................................7

*R.K. Ray Sales, Inc. v. Genova, Inc.,* 478 N.E.2d 616 (Ill. App. Ct. 1985) ...........................12, 17

*Robert L. Rentto Prof'l Law Corp. v. Four Seasons No. 1500, LTD*, 2005 WL 2767186
 (Cal. Ct. App. Oct. 26, 2005)..................................................................................................33

*Robinson v. Board of Educ. of City of Chicago*, 1999 WL 1209493 (N.D. Ill. Feb. 4, 1999)......10

*Robinson v. SABIS*, 2000 WL 343251 (N.D. Ill. Mar. 31, 2000)...........................................11, 18

*Shah v. Atlantic Richfield Co.*, 1987 WL 6305 (N.D. Ill. Feb. 5, 1987)......................................24

*Sobel v. Franks,* 633 N.E.2d 820 (Ill. App. Ct. 1994) ..................................................................17

*St. Paul Fire & Marine Ins. Co. v. Great Lakes Turnings, Ltd.*, 774 F. Supp. 485
 (N.D. Ill. 1991)..........................................................................................................................7

*Steinmetz v. Kern*, 32 N.E.2d 151 (Ill. 1941).........................................................................12, 16

*Stopka v. Alliance of Am. Ins.*, 1996 WL 494269 (N.D. Ill. 1996) .................................................9

*Tolan v. KLLM Architects, Inc.*, N.E. 2d 288 (Ill. App. Ct. 1999) .................................................7

*TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584 (7th Cir. 2005).....................................................29

*United States v. Kasuboski*, 834 F.2d 1345 (7th Cir. 1987).........................................................33

*Vaughn v. King*, 167 F.3d 347 (7th Cir. 1999) .............................................................. 14

*Vendo Co. v. Stoner,* 321 N.E.2d 1 (Ill. 1974) ....................................................... 14, 22

*Wilshire Oil Co. of Texas v. Riffe*, 406 F.2d 1061 (10th Cir. 1969) ............................. 16

*Winskunas v. Birnbaum,* 23 F.3d 1264 (7th Cir. 1994) ................................................ 15

**Rules**

Bankr. L.R. 7056-2 ....................................................................................................... 15

Fed. R. Civ. P. 56 ...................................................................................................... 15,

Fed. R. Civ. P. 56(e) .................................................................................................. 32

Fed. R. Evid. 801(c) .................................................................................................... 14

**Other Authorities**

1 Ill. Law & Prac. Agency § 52 .................................................................................. 11

Amanda K. Esquibel, *The Economic Loss Rule and Fiduciary Duty Claims: Nothing Stricter
Than The Morals of the Marketplace?*, 42 Vill. L. Rev. 789 (1997).......................... 5

Edgewater Medical Center ("EMC"), by and through its undersigned attorneys, respectfully submits this Reply Memorandum in Further Support of its Motion for Partial Summary Judgment on Forfeiture of Compensation, Attorneys' Fees and Prejudgment Interest. This Reply Memorandum is filed against Braddock Management L.P. ("Braddock L.P."), as well as its general partner, Bainbridge Management, Inc. ("Bainbridge Inc."), who this Court already has held is jointly and severally liable for EMC's claims against Braddock L.P. and Bainbridge Management L.P. ("Bainbridge L.P.").  (*See* 4/6/05 Mem. Op.) ("Bainbridge Inc., as the general partner of both Bainbridge L.P. and Braddock, is fully liable to EMC as a matter of law.")[1]

## I.    PLAINTIFF IS NOT LIMITED TO CONTRACT REMEDIES.

In their effort to avoid a damages judgment for breach of fiduciary duty, Defendants dust off arguments that should properly have been included in their response to EMC's motion for summary judgment on liability, and make a scarecrow argument that the economic loss doctrine bars recovery.  Both lack merit.  *First*, Defendants have waived the argument that EMC's breach of fiduciary duty claim should be dismissed as "duplicative" of its contract claim.  (Response of Defendant Bainbridge Inc. to Edgewater Medical Center's Motion for Partial Summary Judgment ("Damages Resp.") at 11.)  EMC having moved for summary judgment on liability for both claims, and this Court having granted it without Defendants raising the issue, both waiver and law of the case preclude its consideration now.  *Second*, Defendants' attempt to shoehorn a breach of fiduciary duty claim into the "economic loss" doctrine evidences a gross misunderstanding of that doctrine.  (Damages Resp. at 12-17.)  It is beyond doubt that the economic loss doctrine applies only to *tort* claims, and Illinois courts have staunchly adhered to the principle that breach of fiduciary duty is not a tort.  The fact that the fiduciary duty in this case arose from an agent/principal relationship created by contract is of no moment.

### A.    Defendants' Argument that EMC's Breach of Fiduciary Duty Claim Should be Dismissed is Untimely and Precluded by the Law of the Case.

In its Complaint, EMC stated claims for both breach of fiduciary duty and contract, among others.  (First Amended Complaint ¶¶ 118-23, 180-84.)  Defendants did not move to

---

[1] Because Bainbridge L.P. filed for bankruptcy protection under Chapter 7 on September 28, 2005 in the Northern District of Indiana, the automatic stay prevents EMC from proceeding directly against Bainbridge L.P. at this time. Additionally, Defendants' response – which is explicitly brought only in the name of Bainbridge Inc. – asserts that Braddock L.P. did not file a response to EMC's summary judgment motion because it was "dissolved by the California Secretary of State" on November 1, 2004, and therefore "no longer exists." (Damages Resp. at 1.) However, as discussed *infra* at Section IV, Braddock L.P. should be held liable either, because it was obligated to respond and its failure to do so constitutes waiver, or because Bainbridge L.P. purports to "speak" on its behalf.

dismiss either claim.  EMC then moved for summary judgment on both claims.  (Memorandum
in Support of Partial Summary Judgment ("Liability Mem.") at 13-19.)  In their Opposition,
Defendants nowhere argued, as they do now, that summary judgment on the breach of fiduciary
duty claim should have been denied because it is somehow "duplicative" of EMC's contract
claim.  This Court granted EMC's motion for summary judgment on both claims.  (4/6/05 Mem.
Op. at 17.)  Now, with the amount of damages they shall pay the only issue remaining,
Defendants want a clean slate, and essentially move to dismiss the breach of fiduciary duty
claim.  However, arguments on the merits not raised in response to a motion for summary
judgment are waived.  *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir.
1999) (party not raising legal arguments on the merits in response to a motion for summary
judgment waives those arguments); *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996)
(same); *Blakely v. Brach & Brock Confections, Inc.*, 181 F. Supp. 2d 943, 950-951 (N.D. Ill.
2002) (same).

Not only have Defendants waived this argument, but that the two causes of action can co-
exist is now the law of the case.  "[T]he doctrine of law of the case establishes a presumption that
a ruling made at one stage of a lawsuit will be adhered to throughout the suit."  *Avitia v. Metro.
Club*, 49 F.3d 1219, 1227 (7th Cir. 1995); *see also Donohoe v. Consol. Operating & Prod.
Corp.*, 30 F.3d 907, 910 (7th Cir. 1994) ("[W]hen a court decides upon a rule of law, that
decision should continue to govern the same issues in subsequent stages in the same case.").  In
its liability ruling, this Court entered judgment on both claims as a matter of law, necessarily
contemplating that there was no legal bar to both going forward.  That Defendants chose not to
make the argument previously does not preclude application of the doctrine:  "The twin goals of
[the law of the case] are to ensure that the parties marshal all of their facts and arguments so that
a dispute may be resolved in one pass, and to conserve judicial resources. Treating new
arguments as grounds for a second decision would contradict both rationales and in practical
effect abandon the doctrine."  *Peoples v. United States*, 403 F.3d 844, 846-847 (7th Cir. 2005).

Although earlier rulings are not enshrined, "as a rule courts should be loathe to [revisit
them] in the absence of extraordinary circumstances such as where the initial decision was
'clearly erroneous and would work a manifest injustice.'"  *Payne v. Churchich*, 161 F.3d 1030,
1037 n.8 (7th Cir. 1998) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800
(1988)); s*ee also Donohoe*, 30 F.3d at 910; *Pearson v. Edgar*, 1999 U.S. Dist. LEXIS 4388, at *9

(N.D. Ill. Mar. 22, 1999). Defendants do not even address the clear error or manifest injustice standards. Instead, they blithely ignore this Court's grant of summary judgment and cite inapposite cases, all of which assess the sufficiency of fiduciary duty claims at the *motion to dismiss* stage. (Damages Resp. at 11) (citing *Majumdar v. Lurie*, 653 N.E.2d 915 (Ill. App. Ct. 1995); *Metrick v. Chatz*, 639 N.E.2d 198 (Ill. App. Ct. 1994); *Kirkland & Ellis v. CMI Corp.*, 1996 U.S. Dist LEXIS 14346 (N.D. Ill. Sept. 29, 1996); and *Calderon v. Southwestern Bell Mobile Sys.*, 2003 U.S. Dist. LEXIS 18257 (N.D. Ill. October 10, 2003).) Not only has this Court already held that EMC adequately pled a breach of fiduciary duty, it has granted EMC summary judgment on this claim.

Moreover, none of the four cases Defendants cite – tellingly, without discussion or even parenthetical – stands for the proposition that a breach of fiduciary duty claim is trumped by a contract claim when they arise from the same operative facts. To the contrary, the parties whose claims were dismissed in *Majumdar,* 653 N.E.2d at 920-21, *Metrick,* 639 N.E.2d at 203, and *Kirkland & Ellis*, 1996 U.S. Dist LEXIS 14346, at *24-25, did not even assert contract claims. In *Calderon,* 2003 U.S. Dist. LEXIS 18257, the contract claim was dismissed along with the breach of fiduciary duty claim. Clearly, therefore, neither claim in *Calderon* trumped the other.

> **B.      The Economic Loss Doctrine Does Not Apply.**

Defendants next attempt to avoid EMC's breach of fiduciary duty claim by raising the smokescreen of the economic loss doctrine. However, that doctrine applies to preclude only tort, not fiduciary duty claims. Nor is EMC's breach of fiduciary duty claim brought within that doctrine by virtue of the fact that the duty arose from an agent/principal relationship created by contract; courts routinely allow recovery for breaches of fiduciary duties having their roots in contractual obligations.

> **1.      The Economic Loss Doctrine Bars Tort Claims, Not Breach of Fiduciary Duty Claims.**

The economic loss doctrine, often referred to as the *Moorman* doctrine after the seminal Illinois decision adopting it, originated in product liability cases. As originally conceived, it prevented plaintiffs who suffered a purely economic loss from defective goods, as opposed to personal injury or property damage, from recovering on the tort theories of strict liability, negligence, and innocent misrepresentation. *See, e.g., Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443 (Ill. 1982) (adopting economic loss rule to bar a tort suit against a manufacturer of a defective grain storage tank). *Moorman*'s rationale was that the Uniform Commercial Code

("UCC") provided the appropriate remedy for purely economic losses, and would be supplanted were tort suits allowed to go forward even in the absence of physical injury or property damage. *See, e.g.*, *id.* at 78-80, 88; *Mut. Serv. Cas. Ins. Co. v. Elizabeth State Bank*, 265 F.3d 601, 617 (7th Cir. 2001) (reviewing and relying in part upon the UCC rationale for the economic loss doctrine).

The doctrine has since been loosened from its product liability moorings, and is now applied to torts in other contexts, including, *inter alia*, suits involving services provided pursuant to contract. *See, e.g., Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 636 N.E.2d 503, 513-515 (Ill. 1994) (observing that the doctrine had been extended to preclude some torts based on service contracts, but declining to apply it to a negligence claim against an accountant.) Defendants, however, seek to expand the theory beyond any decision of an Illinois court and propose, with no accompanying rationale, applying the doctrine to a whole new area of law – breach of fiduciary duty claims. But since its origin, the economic loss doctrine has been applied to limit *tort* claims, not fiduciary duty claims, as the cases Defendants cite, and even the very passages they quote, demonstrate. (Damages Resp. at 12.)[2] The Northern District of Illinois has stated this fundamental point: "the economic loss doctrine prohibits recovery on the basis of tort law only." *Aaron Transfer & Storage v. Bekins Van Lines*, 2002 U.S. Dist. LEXIS 21789, at *5 (N.D. Ill. Nov. 12, 2002); s*ee also American United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 926 (7th Cir. 2003) (economic loss doctrine is concerned with recovery in tort); *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.,* 176 Ill. 2d 160, 163 (Ill. 1997) (same).

Since breach of fiduciary duty is not a tort, the economic loss doctrine does not apply to a breach of fiduciary duty claim. *See Kinzer v. City of Chicago*, 128 Ill. 2d 437, 445 (Ill. 1989) ("This court has not accepted the Restatement (Second) of Torts view but has regarded breach of fiduciary duty as controlled by the substantive laws of agency, contract . . . and equity.") (citations omitted); *Bank One, N.A. v. Borse*, 351 Ill. App. 3d 482, 488 (Ill. App. Ct. 2004) (same); *Ha-Lo Indus. v. Kelly*, 2004 Bankr. LEXIS 8, at *4 (Bankr. N.D. Ill. Jan. 5, 2004) (same). This is not a novel syllogism; numerous courts have arrived at the same conclusion, refusing to apply the economic loss doctrine to breach of fiduciary duty claims. *See*, *e.g.*, *Monarch Gems v. Malca-Amit USA, L.L.C.*, 2005 U.S. Dist. LEXIS 9971, at *6 (N.D. Ill. May 4,

---

[2] Even *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 865 (7th Cir. 1999), which, as Defendants fail to note, applies Wisconsin rather than Illinois law, observed that the economic loss doctrine grew out of the fear that "duplicative <u>tort </u>remedies would undermine contract law." (emphasis added)

2005) ("According to the plaintiffs, because their negligence claim is predicated on a breach of fiduciary duty, the economic loss doctrine is inapplicable. The court agrees."); *Aaron Transfer*, 2002 U.S. Dist. LEXIS 21789, at *5 ("[T]o the extent that defendant is asserting counterclaims on the basis of breach of fiduciary duty, rather than contract, such claims would not be barred by the economic loss doctrine.").[3]

**2.   Fiduciary Duty Claims Are Not Barred By the Economic Loss Doctrine Even Where the Duty Arises From Contractual Obligations.**

Defendants even concede that fiduciary duty claims are not barred by the economic loss doctrine. (Damages Resp. at 13.) Their only response to this well-settled point of law is to argue that where a fiduciary duty is premised upon a contractual relationship, the economic loss doctrine is nevertheless triggered. (Damages Resp. at 3-4, 14-17.) Such would be an illogical result, and has no support in the case law. A fiduciary duty that has its underpinnings in contract is not thereby transmogrified into a tort. Nor have Defendants cited a single Illinois case among the multitudes invoking the economic loss doctrine which holds that the doctrine applies to fiduciary duty claims where the fiduciary duty arises from a contractual relationship.[4] Instead, Defendants tie themselves into knots trying to argue that two cases they are forced to acknowledge *refused* to apply the economic loss doctrine to fiduciary duty claims somehow require its application in the present case. (Damages Resp. at 14-16 (discussing *FDIC v. Miller*, 781 F. Supp. 1271 (N.D. Ill. 1991), and *Choi v. Chase Manhattan Mortg. Co.*, 63 F. Supp. 2d 874 (N.D. Ill. 1999)).) Neither case stands for the proposition that fiduciary duties arising from contractual relationships may not be the basis of recovery. *Miller* allowed claims for both breach

---

[3] *See also Inter-Asset Finanz Ag, v. Refco, Inc.*, 1993 U.S. Dist. LEXIS 8418, at *7 (N.D. Ill. June 21, 1993) ("There is no indication that a service relationship involving fiduciary and agency duties would come under the *Moorman* doctrine."); *Forsyth v. Polsky*, 1993 U.S. Dist. LEXIS 3125, at *22 (N.D. Ill. March 11, 1993) ("[I]nsofar as [plaintiff's] 'negligence' count is actually premised on a breach of fiduciary duty claim, it will not be dismissed" under the economic loss doctrine).

[4] That courts distinguish between tort claims and fiduciary duty claims in applying the economic loss doctrine is no accident. As one scholar has reasoned,

> Application of the [economic loss doctrine] to bar breach of fiduciary duty claims erodes the higher standard of loyalty and care that one traditionally associates with a fiduciary relationship. Barring claims for breach of fiduciary duty does not encourage the utmost fairness by a fiduciary, nor does it discourage overreaching by a fiduciary. A fiduciary relationship is, by definition, an unequal one in that the fiduciary is, in some sense, the superior of his charge. In this light, relegating a victim of a breach of fiduciary duty to an "arm's length," "bargained for" remedy infers that a fiduciary relationship has no special meaning to society.

Amanda K. Esquibel, *The Economic Loss Rule and Fiduciary Duty Claims: Nothing Stricter Than The Morals of the Marketplace?*, 42 Vill. L. Rev. 789, 841 (1997) (footnote omitted).

of fiduciary duty and breach of contract to proceed, stating that, while "fiduciary duties may coexist with contractual duties, the two are distinct and impose separate, independent obligations." *Miller*, 781 F. Supp. at 1277. *Choi* also allowed a breach of fiduciary duty claim to go forward; Defendants' tortured discussion of this case misses the point entirely. *Choi*, 63 F. Supp. 2d at 886. The issue the *Choi* court contemplated in the paragraphs Defendants quote was not whether a breach of fiduciary duty claim arising from a contractual relationship could proceed despite the economic loss doctrine, but whether there was any *fiduciary* duty at all*, as* opposed to an implied contractual duty. *Id*. at 885-86.[5] Here, in stark contrast, this Court has already ruled that Defendants owed EMC a fiduciary duty. (4/6/05 Mem. Op. at 9.)[6]

Moreover, in their attempt to fit the present case into a rule they unsoundly derive from *Miller* and *Choi*, Defendants again attempt to raise arguments they have long since waived, and which contradict the established facts of this case. Defendants now argue, for the first time, that "the only source of the fiduciary duty is affirmative imposition of that duty in the agreed-upon language of the Management Agreements," referring to a fiduciary duty clause in the Management Agreements. (Damages Resp. at 14; *see also id*. at 17 n.4) But, of course, the appropriate time to have made this argument would have been in response to Plaintiff's explicit argument in their summary judgment motion for liability that:

> ***Independent of the fiduciary duty provisions of the Management Agreements***,
> [Defendants] also owed fiduciary duties to EMC as EMC's agents. Under Illinois law, it
> is well established that where "one voluntarily acts as an agent for another, as
> [defendants] did here, 'a fiduciary relationship exists as a matter of law.'"

(Liability Mem. at 13 (emphasis added, citations omitted).) Instead, as this Court observed, Defendants conceded in their Response to EMC's motion for summary judgment on liability that they had breached their fiduciary duty to EMC. (4/6/05 Mem. Op. at 9.) Having chosen to hang fire, they have waived the argument that the fiduciary clauses in the Management Agreements were the sole source of Defendants' fiduciary duty to EMC. *See, e.g.*, *Caruso*, 197 F.3d at 1197 (arguments not raised in response to a motion for summary judgment are waived). Moreover, apart from this belated naked assertion, Defendants have never challenged EMC's argument,

---

[5] While the court concluded that plaintiffs had pled the existence of a bank's duty to manage an escrow account with due care, it was unsure whether the duty should be an implied contract term, or a duty separately arising from the nature of the parties' relationship. *Id*.

[6] Nor does *Congregation of the Passion,* 636 N.E.2d 503, advance Defendants' argument on this point in any way. (Damages Resp. at 14.) That case was concerned with *tort* duties, not fiduciary duties.

made both in its Liability and Damages Motions, that the duties Defendants assumed in the Management Agreements made them agents of EMC, thereby giving rise to a fiduciary duty as a matter of law *irrespective* of the specific mention of a fiduciary obligation in the contracts. (*See* Liability Mem. at 13-14; Damages Mem. at 7-10); *see also Letsos v. Century 21-New West Realty*, 675 N.E. 2d 217, 224 (Ill. App. Ct. 1996)("Once an agency relationship is found, a fiduciary relationship arises as a matter of law."); *Kurtz v. Solomon*, 656 N.E. 2d 184, 190 (Ill. App. Ct. 1995) (same).

That the agent/principal relationship – and thus the corresponding fiduciary duty – was established by way of written agreement is of no moment. It does not trigger the economic loss doctrine, as courts expressly have held. *See, e.g., Ploog v. HomeSide Lending, Inc.*, 209 F. Supp. 2d 863, 875 (N.D. Ill. 2002) (*Moorman* doctrine inapplicable to breach of fiduciary duty claim where a "mortgage contract gave rise to a fiduciary relationship" between plaintiff and defendant); *Illinois Constructors Corp. v. Morency & Assocs., Inc.*, 802 F. Supp. 185, 188, 190 (N.D. Ill. 1992) (*Moorman* doctrine inapplicable to fiduciary duty claim where duty arose from contract between insurance broker and insured); *St. Paul Fire & Marine Ins. Co. v. Great Lakes Turnings, Ltd.*, 774 F. Supp. 485, 490 (N.D. Ill. 1991) (same). Notably, here, as in *Aaron Transfer & Storage*, the parties set forth an agency relationship in a contract which explicitly referred to a "fiduciary relationship." 2002 U.S. Dist. LEXIS 21789, at *1. Applying the principles outlined above, the Northern District of Illinois reasoned that even if a counterclaim asserted a breach of fiduciary duty "rather than contract [claim], such claims would not be barred by the economic loss doctrine" because "[i]n Illinois, claims for breach of fiduciary duty are rooted in the substantive laws of agency, contract and equity, rather than tort." *Id*. at *5. The economic loss doctrine thus has no bearing on this case.[7]

---

[7] Even if EMC's fiduciary duty claim were within the general ambit of the economic loss doctrine, an exception to that doctrine operates to exclude it. Since its origin, the economic loss doctrine has never applied to claims for "fraud or intentional misrepresentation." *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 719 N.E. 2d 288, 291 (Ill. App. Ct. 1999); *see also Moorman*, 435 N.E.2d at 88-89. Because EMC's fiduciary duty claim is premised upon Defendants' fraudulent conduct, this same exception should apply. *See, e.g., Cumis Ins. Soc'y v. Peters*, 983 F. Supp. 787, 792 (N.D. Ill. 1997) (plaintiff was not barred from recovering economic losses where it alleged "that defendants intentionally made false representations"); *Kingsford Fastener, Inc. v. Hitachi Koki, U.S.A., Ltd.*, 2002 U.S. Dist. LEXIS 8657, at *8 (N.D. Ill. May 15, 2002) (declining to apply the doctrine to claims for fraud and intentional misrepresentation because they "fall squarely within the exception to the Economic Loss Rule for fraud").

## II.  DEFENDANTS' WILLFUL AND DELIBERATE BREACH OF FIDUCIARY DUTY REQUIRES COMPLETE FORFEITURE OF ALL COMPENSATION PAID TO DEFENDANTS DURING THE PERIOD IN WHICH THEY USED EMC AS A VEHICLE TO COMMIT MEDICARE FRAUD.

In a further attempt to avoid summary judgment, Defendants contend that, even if EMC is not limited to contract damages, forfeiture of all amounts paid under the Management Agreements is not a proper remedy for Defendants' breach of fiduciary duty.  (Damages Resp. at 4, 17-22.)  Defendants raise a number of cursory and unsupported arguments in this regard, but as demonstrated below, none of them provide a basis for denying complete forfeiture here.

### A.  A Willful and Deliberate Breach of Fiduciary Duty Requires Complete Forfeiture.

As an initial matter, Defendants assert that the appropriate remedy for breach of fiduciary duty is within the equitable discretion of the court and accuse EMC of contradicting "clear Illinois Supreme [Court] precedent in arguing that forfeiture of all compensation is required anytime a party is found to have breached his fiduciary duty."  (Damages Resp. at 4, 17-18.) That accusation fundamentally distorts EMC's position.  EMC never has argued that complete forfeiture is required *anytime* a party is found to have breached a fiduciary duty, no matter how *de minimis* that breach.  Rather, as EMC clearly stated in its opening brief, "Illinois law permits a complete forfeiture of all compensation an agent receives from its principal during a time when the agent breaches his fiduciary duty to the principal," but "[a]s a matter of public policy, a *willful and deliberate* breach of fiduciary duty *requires* complete forfeiture of all compensation during the period of the breach."  (Damages Mem. at 7.)[8]  Defendants simply ignore this critical distinction between an ordinary breach of fiduciary duty, for which complete forfeiture is discretionary, and a willful and deliberate breach of fiduciary duty (which is present here), for which complete forfeiture is required.

*In re Marriage of Pagano*, 607 N.E.2d 1242 (Ill. 1992), the primary case upon which Defendants purport to rely, does not hold to the contrary.  The *Pagano* court merely recognized that, "[w]hile the breach may be so egregious as to require the forfeiture of compensation by the

---

[8] Notably, a number of courts in Illinois have stated that a breach of fiduciary duty *requires* complete forfeiture without any discussion of the "willful and deliberate" element.  *See, e.g., Black v. Hollinger Int'l, Inc.*, 2004 WL 2496590, at *2 (N.D. Ill. Nov. 3, 2004) ("Under Illinois law, it is well established that 'employees who breach their fiduciary duties are required to forfeit all compensation received during the period of the breach.'") (quoting *Archer Daniels Midland Co. v. Whitacre*, 60 F. Supp. 2d 819, 824 (C.D. Ill. 1999)).  Nevertheless, EMC has never argued that complete forfeiture is required (as opposed to permissible) absent a willful and deliberate breach of fiduciary duty.

fiduciary as a matter of public policy, such will not always be the case." *Id.* at 1250. EMC has never argued otherwise. Furthermore, the *Pagano* court did not have occasion to grant complete forfeiture because the court affirmed the lower court's finding that plaintiff failed to establish any breach of fiduciary duty by her former counsel. *See id.* at 1248-49. Thus, although the appropriate remedy for an agent's breach of fiduciary duty generally is within the equitable discretion of the court, "complete forfeiture of all compensation [received] during the period of the breach" is required where a plaintiff can show a "willful and deliberate breach of fiduciary duty." *LID Assocs. v. Dolan*, 756 N.E.2d 866, 886 (Ill. App. Ct. 2001); *see also Stopka v. Alliance of Am. Ins.*, 1996 WL 494269, at *5 (N.D. Ill. Aug. 27, 1996); *ABC Trans Nat'l Transp., Inc. v. Aeronautics Forwarders, Inc.*, 413 N.E.2d 1299, 1315 (Ill. App. Ct. 1980) ("As a matter of public policy . . . one who breaches fiduciary duties has no entitlement to compensation during a willful or deliberate course of conduct adverse to the principal's interests.").

**B.    Regardless of Whether Complete Forfeiture is Required or Discretionary, the Court Should Order Complete Forfeiture Based on the Willful and Deliberate Nature of Defendants' Breach of Fiduciary Duty.**

As discussed above, where, as here, the plaintiff has proven a "willful and deliberate" breach of fiduciary duty, complete forfeiture of all compensation received during the period of the breach is required as a matter of public policy. *See, e.g., LID Assocs.*, 756 N.E.2d at 886; *Stopka,* 1996 WL 494269, at *5. But even assuming *arguendo* that complete forfeiture is not strictly required, this Court nevertheless should exercise its discretion to grant complete forfeiture in this case because the undisputed facts clearly demonstrate the willful and deliberate nature of Defendants' breach. *See, e.g., Greyhound Fin. Corp. v. TSM Fin. Group, Inc.,* 1993 U.S. Dist. LEXIS 10873, at *4, 8, 12-13 (N.D. Ill. Aug. 5, 1993) (exercising "sound discretion" to grant specific performance on summary judgment because specific performance would be "the better and fairer" course of action); *FTC v. Febre,* 1996 U.S. Dist. LEXIS 14297, at *12 (N.D. Ill. Sept. 27, 1996) (exercising "equitable power" to grant disgorgement to the U.S. Treasury because it would "strip the wrongdoer of ill-gotten gains, thereby deterring future deception"); *Blocklinger v. Schlegel*, 374 N.E.2d 491, 493-94 (Ill. App. Ct. 1978) (affirming grant of specific performance on summary judgment where the basic underlying facts were not in dispute).

1.      **Defendants Do Not Rebut Any of the Arguments in EMC's Opening
Brief Demonstrating the Willful and Deliberate Nature of Defendants'
Breach.**

In its opening brief, EMC argued that this Court "already has decided that Defendants'
breach here was indeed willful and deliberate." (Damages Mem. at 10.) Specifically, EMC
pointed out that, in its April 6, 2005 Memorandum Opinion, the Court determined that
Defendants' guilty "pleas in the criminal case required an admission of guilt" that they
"knowingly and willfully executed a scheme to commit Medicare fraud" and that Defendants
guilty pleas conclusively "establish the fact that the [D]efendants used their position at EMC to
operate a scheme both in violation of the law and against the interests of EMC." (*Id.*) (quoting
4/6/05 Mem. Op. at 8-9.) Defendants offer absolutely no response to this argument. As such,
Defendants have conceded the same. *See Arendt,* 99 F.3d at 237 (failure to respond to arguments
in response to summary judgment motion results in waiver); *Buxton v. Equifax Credit Info.
Servs., Inc.*, 2003 WL 22844245, at *4 (N.D. Ill. Dec. 1, 2003) (plaintiff conceded defendant's
argument by failing to address it in opposition to defendant's motion for summary judgment);
*Robinson v. Board of Educ. of City of Chicago*, 1999 WL 1209493, at *6 (N.D. Ill. Feb. 4, 1999)
(plaintiff conceded argument by failing to provide a meaningful response to defendant's
argument).

But even apart from this Court's prior ruling, EMC's opening brief amply demonstrates
the willful and deliberate nature of Defendants' breach via application of several common-sense
factors:

(i.)    Willfulness of the Breach. Defendants knowingly and intentionally violated the
terms of the Management Agreements, which specifically required Defendants to perform their
duties in compliance with all applicable federal and state law and to use their best efforts and all
due diligence to ensure EMC maintained in good standing all necessary accreditations, licenses,
permits, and authorizations required for EMC's ongoing operations. (Damages Mem. at 12.) By
knowingly committing health care fraud, Defendants ensured quite the opposite result; *i.e.*, that
EMC would lose its accreditations, licenses, permits, *etc.*, and ultimately have to close its door to
the public. And, of course, Defendants lacked any moral or other justification for their wrongful
actions. *See, e.g.,* Restat. 2d of Agency, § 456 comment c (stating that a breach is considered
"willful and deliberate" when "the agent, in complete disregard of his contractual obligations,

fails to perform or misperforms the promised services and has no substantial moral excuse for so doing").

(ii)     <u>Seriousness of the Violation</u>.  Defendants' breach of fiduciary duty was extremely serious insofar as it involved violations of federal criminal statutes and jeopardized the safety and well-being of numerous EMC patients.  (Damages Mem. at 12.)

(iii)    <u>Length of the Violation</u>.  Defendants' breach was not an isolated occurrence, but rather a continuing course of wrongful conduct spanning a period in excess of five years.  (*Id*. at 13.)

(iv)     <u>Potential for and Actual Harm to the Principal</u>.  Defendants' breach exposed EMC to several obvious and serious risks, including the suspension of Medicare payments, potential criminal liability under numerous federal criminal statutes, reputational harm for endangering patients, and a myriad of expensive civil lawsuit.  (*Id*.)  And, as a result of Defendants' fraudulent conduct, Medicare *actually* suspended payments to EMC and EMC *actually* was sued in numerous medical malpractice lawsuits.  (*Id*.)

Significantly, Defendants do not dispute the relevance of these factors or, more importantly, their application to the wrongdoing at issue here.  Thus, based upon the application of these factors, complete forfeiture is proper.

**2.      <u>Defendants' Arguments Against Complete Forfeiture Are Unavailing</u>.**

Instead of responding to the facts and arguments in EMC's opening brief establishing forfeiture, Defendants assert a series of meritless arguments against forfeiture – a number of which this Court already has rejected.

*First*, Defendants contend that this Court has no factual basis upon which to assess the fairness of complete forfeiture because "any assessment of that fairness would require an assessment of the actual economic harm sustained by Edgewater, and Edgewater has offered no showing (let alone an undisputed showing) along those lines."  (Damages Resp. at 18.)  But as numerous cases make clear, a principal need not establish economic harm in order to receive forfeiture of compensation.  *See, e.g., McLaughlin v. Chicago Transit Auth.,* 243 F. Supp. 2d 778, 779 (N.D. Ill. 2003) ("'[F]orfeiture-of-salary damages are available even where the defendant employer is not otherwise injured by the breach.'") (quoting *Robinson v. SABIS*, 2000 WL 343251, at *3 n.2 (N.D. Ill. Mar. 31, 2000)); *ABC,* 413 N.E.2d at 1315 ("'[I]t makes no difference whether the result of the agent's conduct is injurious to the principal or not, as the

misconduct of the agent affects the contract from considerations of public policy rather than of injury to the principal.'") (quoting *Steinmetz v. Kern*, 32 N.E.2d 151, 154 (Ill. 1941)).[9]  This is because "[a]gency law is designed not only to remedy damages suffered by the principal, it is also intended to remove any temptation an agent might have to breach his fiduciary duties by acting against a principal's best interests."  *Frey v. Fraser Yachts*, 29 F.3d 1153, 1159 (7th Cir. 1994); *see also Hill v. Names & Addresses, Inc.*, 571 N.E.2d 1085, 1096 (Ill. App. Ct. 1991) (noting that public policy requires forfeiture "even when it more than compensates the plaintiff for injury or damage resulting from a breach of loyalty").

Here, it is undisputed that Defendants extracted millions of dollars in fees from EMC while breaching their fiduciary duty.  EMC was harmed to the extent that it paid Defendants for loyal and faithful services, which it did not receive.  *See Lippert Mktg., Ltd. v. Kingwood Ceramics, Inc.*, 1996 WL 648705, at *3 (N.D. Ill. Oct. 31, 1996) ("Illinois courts have found that injury occurs to a principal if the agent breached its fiduciary duty while collecting compensation for its services from the principal."); *McLaughlin,* 243 F. Supp. 2d at 779 (denying motion to dismiss breach of fiduciary duty claim for failure to plead damages where the complaint alleged that the principal "was damaged to the extent of the salary it paid [the agent] during the period when it mistakenly believed her to be a loyal fiduciary"); *R.K. Ray Sales, Inc. v. Genova, Inc.*, 478 N.E.2d 616 (Ill. App. Ct. 1985) (an agent's work is not properly performed when done during a period on which other aspects of the agency contract are being breached "even if the agent's breach does no harm to the principal").

Furthermore, as this Court previously has held, the economic harm to EMC is apparent from the suspension of Medicare reimbursements.  (4/6/05 Mem. Op. at 9.)  Once the government discovered that Defendants used EMC to perpetrate health care fraud, the government suspended all payments to EMC, and shortly thereafter, EMC was forced to close its doors.  (SOF1 ¶¶ 40-41.)  EMC also has been sued in a number of medical malpractice suits as a result of Defendants' misconduct, requiring the expenditure of significant time and resources. (SOF1 ¶¶ 42-44.)  Thus, contrary to Defendants' assertion, EMC has provided ample evidence of

---

[9] *See also* 1 Ill. Law & Prac. Agency § 52 ("An agent forfeits his right to compensation where he fails to perform the duties of his agency, breaches his agreement with the principal, where he is guilty of gross negligence, misconduct, or gross unskilfullness in the business of his agency, *irrespective of whether his misconduct results in injury to the principal*, since the misconduct of the agent affects the contract from considerations of public policy rather than of damage to the principal.") (emphasis supplied).

the economic harm caused by Defendants' breach, despite the fact that it was under no obligation to do so.

*Second,* Defendants argue that forfeiture is unwarranted because EMC "was a co-perpetrator and the primary beneficiary" of the fraudulent scheme. (Damages Resp. at 19.) That argument should be rejected because it merely is an attempt to relitigate this Court's prior ruling. (4/6/05 Mem. Op. at 13-16.) In response to EMC's motion for summary judgment on liability, Defendants did not dispute that EMC proved the required elements for breach of fiduciary duty. (*Id*. at 10.) Rather, Defendants argued – as they do here – that EMC was a co-conspirator and beneficiary of the scheme by asserting three affirmative defenses: dual agency, *in pari delicto*, and ratification. (*Id.*) In raising each of these defenses, Defendants "acknowledge[d] the management companies' culpability in the Medicare fraud scheme and only argue[d] that EMC should also bear some measure of responsibility" because Ehmen supposedly acted as a "dual agent" responsible to both Defendants and EMC, because the physicians involved in the Medicare fraud scheme were purportedly agents of EMC, and because EMC purportedly benefited from the wrongful conduct. (*See id.* at 11-12.) In rejecting these arguments, this Court held that Defendants' affirmative defenses are inapplicable in this case as a matter of law because the allegedly "wrongful actors have been removed [from EMC], first by the appointment of a receiver, next by that receiver's subsequent appointment to the more expansive role of custodian." (*See id.* at 14-15.) The Court reasoned that, where, as here, "a receiver has been appointed to maximize value only for the benefit of creditors, the rationales for [*in pari delicto* type defenses] lose their meaning." (*Id*. at 15.) This holding is now the law of the case, and Defendants are precluded from relitigating the issue. *See, e.g., Donohoe,* 30 F.3d at 910 ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.").[10]

---

[10] In any event, Defendants' argument fails on the merits for all of the reasons previously discussed in EMC's Reply Memorandum in Support of its Motion for Partial Summary Judgment on liability, which EMC incorporates herein. (*See* Liability Reply Mem. at 11-23.) For example, while Defendants assert that the fraud scheme "was conducted by Edgewater's own vice president of marketing (Roger Ehmen)," (Damages Resp. at 19), that assertion ignores the undisputed evidence showing that Ehmen served EMC only as a "subagent," *i.e.*, as an employee of Defendants, EMC's direct agent, and that, under the law of "subagency," an agent (Defendants) is responsible to his principal (EMC) for the actions of a sub-agent (Ehmen). (Liability Reply Mem. at 11-18.) Similarly, while Defendants assert that the fraud scheme was "conducted by . . . Edgewater's own doctors," (Damages Resp. at 20), that assertion ignores the undisputed evidence showing that the doctors were in fact independent contractors, not agents of EMC. (Liability Reply Mem. at 18-21.) Likewise, Defendants ignore that Ehmen's and the doctors' fraudulent acts may not be imputed to EMC for the additional reason that their actions were adverse to EMC's interests. (*Id*. at 17-18,

*Third,* in a related argument, Defendants assert that forfeiture is not warranted because EMC received $13 million as a result of Defendants' fraud.  (Damages Resp. at 18-19.)  To begin with, Defendants provide no admissible evidence, as they must on summary judgment, as to what – if anything – EMC *itself* received out of the proceeds of the fraud scheme.  In asserting that EMC received $13 million from the scheme, Defendants rely entirely upon Defendants' plea agreements.  But those documents (which are themselves inadmissible hearsay when Defendants attempt to use them against EMC)[11] merely state that "Medicare and CMS were fraudulently billed and lost approximately $13,644,598" and do not state what portion of the $13 million went to EMC, as opposed to the participants in the fraud, *i.e.,* Defendants or the physicians and their businesses.  Moreover, EMC has presented unrebutted evidence demonstrating that it paid Defendants in excess of $22 million in the form of management and administrative fees during the period of the fraud.  Thus, to the extent that EMC received any financial benefits from the scheme, Defendants plainly saw to it that those proceeds promptly flowed out of EMC and into Defendants' coffers.  In addition, any claimed "benefit" to EMC pales in comparison with the real damage Defendants' fraud caused:  cessation of Medicare funds, exposure to lawsuits, potential criminal prosecution, and the siphoning of funds out of EMC and into Defendants' pockets through millions in management fees.

*Fourth*, Defendants assert that complete forfeiture would be unfair because the improper Medicare billings inflated Defendants' compensation by no more than $272,891,000 since the highest rate for the Annual Percentage Fee was 2% of net patient revenue and Medicare was fraudulently billed approximately $13,644,598.  (Damages Resp. at 18.)  However, as noted above, Defendants provide no admissible evidence as to the amount of the improper billings.  Moreover, as numerous cases make clear, forfeiture of compensation is not dependent upon the amount of profit derived from the wrongdoing.  *See, e.g., Vendo Co. v. Stoner*, 321 N.E.2d 1 (Ill. 1974); *ABC*, 413 N.E.2d at 1314-15.  Furthermore, Defendants construe their benefit too narrowly:  it is not limited to 2% of the improper billings, but rather includes the total amount of

---

21.)

[11] *See* Fed. R. Evid. 801(c); *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) (holding that plaintiff's testimony as to her own prior out-of-court statement was inadmissible hearsay); *Fucarino v. Thornton Oil Corp*., 1999 WL 691820, at *7 (N.D. Ill. Aug. 23, 1999) (holding that plaintiff's answer to interrogatory was inadmissible on summary judgment because it was "being offered by the party responding to the interrogatory (*i.e.*, [was] not an admission of a party-opponent")).

management and administrative fees they received during the period they were in willful and deliberate breach of their fiduciary duty.

*Fifth*, Defendants claim that it would be unjust to order Defendants to return all compensation they received under the Management Agreements because "most of the services they rendered for Edgewater were proper, useful, and in accordance with the contracts." (Damages Resp. at 20.) That argument too misses the mark. As an initial matter, Defendants do not support their contention with *any* evidence. The only "fact" that Defendants offer in support of their assertion is that EMC earned $433 million in operating revenues during the relevant period and that Defendants wrongdoing constituted just over $13 million. (*Id*. at 4-5.) But Defendants not only fail to provide any evidence of EMC's revenues during the relevant period,[12] they also fail to provide any evidence of what portion of EMC's revenues were attributable to work Defendants performed (as opposed to other independent contractors or employees of EMC) and what percentage of Defendants' time was devoted to performing "proper and useful" services, as opposed to perpetrating (and attempting to conceal) the fraudulent scheme.

Furthermore, Defendants' argument is utterly irrelevant because the rule requiring complete forfeiture of all compensation applies even where the agent performed some legitimate services for the principal during the period of the breach. In each of the cases discussed in EMC's opening brief, the agents actually performed some duties for their principal for which they would normally receive compensation at the same time they were breaching their fiduciary duty of loyalty to their principal. (Damages Mem. at 7-9.) In each instance, the court found that an agent could not expect compensation for the period of time in which the agent was disloyal. (*Id*.) For example, in *ABC* defendants argued that they were entitled to partial compensation because they continued to perform some legitimate services for plaintiff during the period of the

---

[12] In their Statement of Additional Facts, Defendants assert that EMC "earned in excess of $433 million in operating revenue from 1995 to 2000 as reflected in its 1998 Bond Offering, audited and unaudited financial statements and other publicly disclosed documents," but Defendants fail to provide any such documents. (Def. SOF2 ¶ 20.) Defendants then assert in a footnote that, "[a]t this time, Defendant will not burden the court with these voluminous documents, but will be happy to provide copies of these documents if EMC challenges this factual statement." (*Id*.) However, it was Defendants' burden to come forward with admissible evidence creating a genuine issue of material fact both under Fed. R. Civ. P. 56 and Bankr. L.R. 7056-2, and they have not done so here. *See Winskunas v. Birnbaum,* 23 F.3d 1264, 1267-68 (7th Cir. 1994) (to defeat motion for summary judgment, nonmoving party must produce "evidence of evidentiary quality," *i.e.*, admissible evidence); *Kocik v. USF Holland, Inc.,* 2005 WL 442369, at *3 (N.D. Ill. Feb. 22, 2005) ("nonmoving party must support its contentions with admissible evidence"); *Cacique, Inc. v. V&V Supremo Foods, Inc.*, 2004 WL 2222270, at *11 (N.D. Ill. Sept. 30, 2004) ("facts must be supported by relevant, admissible evidence").

wrongful activity. *ABC*, 413 N.E.2d at 1314. The trial court accepted this argument, requiring

defendants to forfeit only one-third of the compensation paid to them during the period of their

breach. *Id*. However, the reviewing court modified the salary forfeiture award on appeal,

holding that plaintiff was entitled to the total compensation it had paid defendants during the

period of their breach. *Id*. While the court agreed that defendants properly retained their

compensation for all periods prior to the commencement of the breach, the court refused to

"extend the apportionment concept to justify the trial court's decision that defendants should

forfeit only one-third of compensation paid to them during the four month period of their breach

of duties." *Id*. After noting the general rule that "'an agent is entitled to compensation only on a

due and faithful performance of all his duties to his principal,'" *id*. at 1314-15 (quoting

*Steinmetz,* 32 N.E.2d at 154), the court explained that:

> The confusion over 'total' versus 'partial' salary forfeiture, as expressed in the
> apportionment principle, is eliminated by the recognition that within the actual
> period of tortious conduct, salary forfeiture is required because the agent's
> services are not being 'properly' performed. The agent retains compensation
> rightfully earned before the breach, for specific periods. As a matter of public
> policy . . . , however, one who breaches fiduciary duties has no entitlement to
> compensation during a willful or deliberate course of conduct adverse to the
> principle's interest.

*Id*. at 1315; *see also Grace v. E.J. Kozin Co.*, 538 F.2d 170, 175 (7th Cir. 1976) (awarding

complete forfeiture where plaintiff had "not challenged the district court's finding that

[defendant] earned his $19,000 per year salary during the three years in question" because

"forfeiture does not depend upon whether the employee earned the salary, but is intended as a

deterrent to wrongful conduct"); *Dowd & Dowd, Ltd. v. Gleason*, 816 N.E.2d 754, 771 (Ill. App.

Ct. 2004) (affirming trial court's order of complete forfeiture of compensation beginning with

the date on which defendants began breaching their fiduciary duty and reasoning that, while

"there was no indication that defendants did not work at the efficiency level or with the diligence

that they had prior to deciding to leave Dowd, they cannot claim a right to retain the

compensation earned while breaching their fiduciary duty to Dowd").[13]

---

[13] Other courts have reached the same conclusion. *See, e.g.*, *Wilshire Oil Co. of Texas v. Riffe*, 406 F.2d 1061, 1062-63 (10th Cir. 1969) (requiring complete forfeiture despite defendant's contention that part of his services were properly performed and that the corporate division for which he was responsible made money during the period in question); *Enstar Group, Inc. v. Grassgreen*, 812 F. Supp 1562, 1573-74 (M.D. Ala. 1993) (requiring complete forfeiture despite defendant's contention that he worked diligently on behalf of plaintiff and that plaintiff profited from his work); *In re Hadleigh D. Hyde Trust*, 458 N.W.2d 802, 805 (S.D. 1990) ("An agent is not entitled to any

Contrary to Defendants' blithe assertion, "[t]he caselaw does not make an allowance in damages for a disloyal employee's periodic loyalty. The entire salary is forfeited under the rationale that the employer is paying for all of the disloyal employee's performance and not just part of it." *County of Cook v. Lynch*, 620 F. Supp. 1256, 1258 (N.D. Ill. 1985). This is particularly true where, as here, Defendants' breach effectively tainted all aspects of their work. Defendants were required to use their best efforts and all due diligence to ensure that EMC maintained in good standing all necessary accreditations, licenses, permits, approvals, *etc*. required for EMC's ongoing operations, and yet Defendants ensured quite the opposite result by using EMC as a vehicle to commit Medicate fraud.

*Sixth*, Defendants (without citing any additional authority) assert that forfeiture only applies to employees – rather than agents – who have breached their fiduciary duty to an employer. By its plain terms, however, the doctrine applies to any <u>*agent*</u> who breaches a fiduciary duty to its <u>*principal*</u>, and is not limited to cases involving an employee/employer relationship. Accordingly, a number of cases have applied the doctrine to agents other than employees. *See, e.g., Sobel v. Franks,* 633 N.E.2d 820, 828 (Ill. App. Ct. 1994) (insurance broker forfeited any commissions earned during period of breach of fiduciary duty); *R.K. Sales, Inc.*, 478 N.E.2d at 619-20 (if agent corporation breached its duty in a willful and deliberate manner, then it is required to forfeit any commissions earned during period of breach).

*Seventh*, Defendants' suggestion that EMC is not entitled to forfeiture because it has not shown a breach of the duty of loyalty also is without merit. (Damages Resp. at 19.) As previously discussed, Defendants breached not only their duty of care, but also their duty of loyalty, in using EMC as a vehicle to commit Medicare fraud. (Liability Mem. at 14-16; Damages Mem. at 11-13.) While purporting to act on behalf of EMC, it is uncontroverted that Defendants used their relationship with EMC, and their control over EMC's operational and financial affairs, to obtain money from Medicare by fraud. Defendants said they would act for EMC's benefit, when in fact they acted for their own benefit and to EMC's detriment. Although Defendants try desperately to minimize the benefit to themselves from the wrongdoing, there can be no legitimate dispute that Defendants breached their fiduciary duty of loyalty and good faith toward EMC by using EMC as a vehicle to line their pockets through a scheme to defraud

---

compensation, even for properly performed services, if the agent is guilty of willful and deliberate disobedient conduct constituting a breach of his agency contract.").

Medicare.  Although Defendants correctly point out that several of the cases cited in EMC's opening memorandum involved situations where the fiduciary was in competition with his employer or usurped the principal's business opportunity, nothing in any of the cases limits the remedy of forfeiture to such factual scenarios and Defendants do not – and cannot – cite any cases saying otherwise.  *See, e.g., Robinson*, 2000 WL 343251, at *2 (noting the availability of forfeiture of compensation and stating that breach of fiduciary duty is not limited to usurpation of the principal's interests, but extends to "a myriad of infidelities and betrayals").

*Finally*, Defendants assert – again, without any authority – that because this Court previously has held that Defendants' dual agency and *in pari delicto* defenses are inapplicable as a matter of law because the "wrongful actors have been removed" from EMC, "[i]t would be incongruous for this Court to now hold that Edgewater may invoke the equitable principle of unjust enrichment, insofar as the Management Companies have not been unjustly enriched *vis-à-vis* the receiver."  (Resp. Mem. at 20.)  But that argument fails on its face.[14]  The Court's rationale for not applying *in pari delicto* type defenses to a receiver who has been appointed to maximize value for the benefit of innocent creditors simply does not apply to Defendants.  Any judgment against Defendants will benefit innocent creditors and be paid by those culpable in the fraud.  This is exactly the equitable result that is contemplated by the forfeiture doctrine.

> **C.     Defendants Should Be Ordered to Forfeit All Compensation Received During the Period of Their Willful and Deliberate Breach of Fiduciary Duty, Including Administrative Manager Reimbursements and Exclusive Corporate Service Fees.**

Defendants further assert that, even if EMC is entitled to the return of all compensation it paid to Defendants during the period of their willful and deliberate breach, Defendants should not be required to forfeit any of the Administrative Manager Reimbursements and Exclusive Corporate Service Fees because the former do not constitute "compensation" and the latter are "entirely separate" from Defendants' wrongdoing.  (Damages Resp. at 21-22.)  Defendants are wrong.

---

[14]To begin with, Defendants reference to "unjust enrichment" is misplaced since EMC has not invoked that particular theory.  Rather, EMC's motion is explicitly based on forfeiture, a different legal theory.

>    **1.      Defendants Should Be Required to Forfeit All Administrative
>             Manager Reimbursements Because Such Payments Were a Form of
>             Compensation and Because Courts Have Held that Reimbursable
>             Expenses Are Subject to Forfeiture.**

Defendants assert – without citing a single case – that they should not be required to

forfeit the $9,198,536.91 EMC paid to Defendants in Administrative Manager Reimbursements

because the payments did not constitute "compensation," but rather were pass-through

expenditures incurred for EMC's account and for which EMC was obligated to reimburse

Defendants. (Damages Resp. at 21-22.) To support their assertion, Defendants principally rely

upon the fact that the provisions regarding Administrative Manager Reimbursements were set

forth in a different section of the Management Agreements than the provisions governing

Monthly Fixed and Annual Percentage Fees. (*Id*. at 21-22.) The Administrative Manager

Reimbursements were discussed under Section III, "Duties of Manager," whereas the Monthly

Fixed and Annual Percentage Fees were discussed under Section VI, "Compensation of

Manager." (Pl. Ex. 1 at §§ 3.01, 6.01; Pl. Ex. 2 at §§ 3.01, 6.01; Pl. Ex. 3 at §§ 3.01, 6.01.)

Also, as Defendants point out, the 1994 and 1997 Management Agreements state that

Administrative Manager Reimbursement shall be considered a "Cost of Operation." (Damages

Resp. at 21; Pl. Ex. 1 at § 3.01; Pl. Ex. 2 at § 3.01.) Defendants' argument on this score

baselessly elevates form over substance. The mere fact that the Management Agreements

discussed Administrative Manager Reimbursement in a different section of the contracts, or

referred to such payments as a "Cost of Operation," does not change the reality that these

payments constituted a form of "compensation" to Defendants.

EMC contracted with Defendants – two limited partnerships – to act as the "sole and

exclusive" manager of the day-to-day operations of EMC. (SOF1 ¶ 10.) Of course, it is

hornbook law that an entity such as a corporation or a partnership can act only through the

conduct of its human agents. *See* Seventh Circuit Pattern Criminal Federal Jury Instr., § 5.03.

As such, the Management Agreements contemplated that Defendants would employ certain

senior managers, known as "Administrative Managers." (SOF2 at ¶ 4; Pl. Ex. 1 at § 3.01; Pl. Ex.

2 at § 3.01; Pl. Ex. at § 3.01.) As clearly explained in each of the Management Agreements, the

Administrative Managers were employees of, and compensated by, Defendants, but EMC was

required to reimburse Defendants for all compensation and expenses they incurred or paid to or

on behalf of the Administrative Managers. (*Id*.) The fact that the Management Agreements

required EMC to reimburse Defendants for the salaries and expenses that Defendants paid *their employees* – as opposed to paying Defendants  higher management fees – does not somehow convert the payments into something other than compensation.  Either EMC could have paid Defendants higher management fees from which Defendants would have had to pay the Administrative Managers or it could have paid those fees in the manner it did here.  Under both scenarios, these were monies that compensated Defendants for their services.

Defendants further claim that EMC's reimbursement to Defendants for the salaries paid by Defendants to their employees "were not monies that benefited the Management Companies." (Damages Resp. at 22.)  But that assertion is obviously ridiculous.  Because EMC reimbursed Defendants, Defendants did not have to pay their employees' salaries out of the Monthly Fixed and Annual Percentage Fees.  In other words, Defendants could retain the full amount of the Monthly Fixed Fees and Annual Percentage Fees, thus increasing their profit.

Regardless of whether the Administrative Manager Reimbursements are more appropriately characterized as "compensation" or as "reimbursable expenses," Defendants still should be required to forfeit those payments as a result of their willful and deliberate breach of fiduciary duty.  Defendants do not cite a single case for the proposition that reimbursable expenses are not subject to forfeiture.  To the contrary, at least one court squarely has held that such "expenses can be forfeited when a breach of fiduciary duty has occurred."  *In re Allied Physicians Group, P.A.,* 2004 WL 2965001, at *3 (N.D. Tex. Dec. 15, 2004).

In *Allied*, defendants argued that the bankruptcy court's order requiring them to forfeit "reimbursed costs and expenses," in addition to other fees, was not warranted absent any finding of injury or causation.  *Id*.  The reviewing court squarely rejected this contention, stating that it "agree[d] with the bankruptcy court that this form of compensation should be forfeited under the remedial regime of *Burrow*."  *Id.; see also Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999) (holding that a client need not prove actual damages to obtain forfeiture of an attorney's fees due to the attorney's breach of fiduciary duty).  While defendants stressed that the "proper limits of the equitable remedy [of forfeiture of compensation] should not exceed the amount of fees actually received," the court noted that defendants (just like Defendants here) "fail[ed] to direct this court to a single case that distinguishes between fees and reimbursable expenses in the context of forfeiture."  *Allied*, 2004 WL 2965001, at *4.  The court further explained that defendants' argument "appear[ed] to gloss over *Burrow's* reasoning that all compensation

received by a disloyal fiduciary is forfeited," stating:  "It is the law that in such instances if the fiduciary takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received.'"  *Id*. (quoting *Burrow*, 997 S.W.2d at 239).  The court rejected defendants' contention that granting forfeiture of reimbursed costs and expenses unduly expanded the remedial scheme of forfeiture, noting that the court's holding merely determined that "the bankruptcy court did not err in allowing forfeiture of all compensation, however denominated, received by [defendants]."  *Id.* at *5

Although *Allied* was decided under Texas law, its reasoning is consistent with Illinois law.  Like Texas, Illinois law recognizes that an agent "who breaches fiduciary duties has no entitlement to compensation during a willful or deliberate course of conduct adverse to the principal's interests."  *ABC*, 413 N.E.2d at 1315.  Thus, like the court in *Allied*, which applied legal principles virtually identical to those applicable under Illinois law, this Court should grant EMC forfeiture of all compensation, <u>*however denominated*</u>, including the Administrative Manager Reimbursements.

> **2.      The Management Agreements Required EMC to Retain Defendants for Corporate Services and These Fees Were Paid During a Time When Defendants Were in Willful and Deliberate Breach of Their <u>Fiduciary Duty</u>.**

Defendants also assert – again, without citing any authority – that they should not be required to forfeit the $1,488,837.98 that EMC paid to Defendants in Exclusive Corporate Service Fees because those services "were entirely separate from management services associated with billing, preparing cost reports, and other activities that might bear upon the Medicare and Medicaid scheme."  (Damages Resp. at 22.)  Defendants' argument fails.

*First*, the Management Agreements themselves <u>*required*</u> EMC to retain and compensate Defendants, exclusively, for corporate projects outside the scope of EMC's routine operations.  (SOF1 ¶ 5; Pl. Ex. 1 at §§ 3.18, 3.19; Pl. Ex. 2 at §§ 3.19, 3.20; Pl. Ex. 3 at §§ 3.17, 3.18.)  Thus, contrary to Defendants' assertion, the Exclusive Corporate Service Fees were not "entirely separate" from Defendants' management services.  *Second*, and more importantly, Illinois courts have held that compensation, such as the fees at issue here, is properly apportioned according to the relevant time period, not according to the particular services performed.  *See, e.g., ABC*, 413 N.E.2d at 1314.  The concept of apportionment allows the breaching party to retain

compensation *before and after* the period of the breach, but not during the time period in which the breach occurred. *See, e.g., Vendo Co.,* 321 N.E.2d at 14 (distinguishing between total forfeiture of a breaching agent's salary and forfeiture "only for the period of time beginning with the breach of his duty of loyalty," and finding the latter the proper measure of damages); *Veco Corp.,* 611 N.E.2d at 1060-62 (holding that the proper measure of damages was full forfeiture of compensation during the period of the breach). *Finally*, had EMC known that Defendants were committing Medicare fraud, EMC plainly would not have retained Defendants to perform additional services on EMC's behalf.

> **D.     There Is No Disputed Issue of Fact Regarding the Amount of Compensation EMC Paid to Defendants During the Period of Their Breach.**

In its opening brief, EMC demonstrated that its claim for forfeiture should be resolved on summary judgment because there is no disputed issue of fact regarding (1) the period during which Defendants breached their fiduciary duty to EMC by committing Medicare fraud, or (2) the amount EMC paid to Defendants for services performed during that period. (Damages Mem. at 14-15.) Defendants' response merely underscores this point.

Defendants do not – and cannot – even attempt to dispute that they breached their fiduciary duties to EMC between January 1995 and December 2000.

Nor do Defendants dispute in any material way the amount EMC paid to Defendants for services performed during that period. In its Statement of Undisputed Material Facts, EMC presented for each payment during the relevant time period undisputed proof of payment in the form of a cancelled check endorsed by Defendants and/or a corresponding entry in Defendants' General Ledger. (SOF2 ¶¶ 9(a)-106(a).) For each payment, EMC presented proof of the type of fee EMC paid Defendants, including Defendants' invoices to EMC, Defendants' General Ledger entries, EMC's check registry, and/or detailed check requests. (SOF2 ¶¶ 9(b)-106(b).) The grand total for these payments, as detailed in EMC's Statement of Undisputed Facts, was $22,480,843.82, broken down by type of fee as follows: (1) $9,198,535.91 in Administrative Manager Reimbursement, (2) $1,488,837.98 in Exclusive Corporate Service Fees, (3) $7,325,351.48 in Monthly Fixed Fees, and (4) $4,468,117.15 in Annual Percentage Fees. (SOF2 ¶ 106.)

Defendants *agree* with these figures. In their Statement of Additional Facts, Defendants assert that, from 1995 through 2000, "the Management Companies received a total of $9,198,536.91 as reimbursements for administrative management costs" and "a total of

$1,488,837.98 for exclusive corporate services." (Def. SOF2 ¶ 15.) Thus, by Defendants' own words, there is no dispute as to the amount of money Defendants received in Administrative Manager Reimbursement or Exclusive Corporate Service Fees during the relevant period.[15]

Defendants also admit the amount of the remaining fees. For example, in Paragraph 8 of EMC's Statement of Undisputed Facts, EMC provided a chart summarizing each payment EMC made to Defendants and specified the following information for each payment: (i) Check or Ledger Date, (2) Check Number (where applicable), (iii) Check or Ledger Amount, (iv) Fixed Fees Sought, (v) Percentage Fees Sought, (vi) Administrative Manager Reimbursement Sought, (vii) Corporate Service Fees Sought, and (viii) Total Recovery Sought. (SOF2 ¶ 8.) Defendants _admit_ Paragraph 8 in its entirety, with one immaterial exception. (Def. Resp. to SOF2 ¶ 8.)[16]

Notably, Defendants assert in their Statement of Additional Facts that, from 1995 through 2000, the Management Companies received a combined total of $11,600,530.83 in Monthly Fixed Fees and Annual Percentage Fees. (Def. SOF2 ¶ 13 & Ex. 2.) While that amount is $192,937.80 less than the combined total of $11,793,468.63 set forth in EMC's Statement of Undisputed Facts, the Court should disregard this purported discrepancy since Defendants admit each of the underlying payments set forth in EMC's Statement of Undisputed Facts (Def. Resp. to SOF2 ¶ 8-106) – which together add up to $11,793,468.63 in Monthly Fixed and Annual Percentage Fees. Moreover, the purported discrepancy between EMC's figure and Defendants' figure is due entirely to a computation error in Defendants' Exhibit 2 and Defendants' omission of an entry for the January 1996 Fixed Fees in the amount of $64,312.50 from said exhibit. (_See_ Def. Ex. 2; SOF2 ¶ 24 & Ex. 7, at Tab 16.) When the amounts in column one of Defendants' Exhibit 2 are added correctly, the total amount equals $11,729,155.83, which is $64,312.80 less than the amount EMC claims. The resulting difference is explained by the omission of the January 1996 Fixed Fees from Defendants' Exhibit 2. (_See_ SOF2 ¶ 24 & Ex. 7, at Tab 16.)[17]

---

[15] Defendants' total for Administrative Management Reimbursement is actually $1 higher than EMC's total for those payments. However, this calculation error does not create a genuine issue of material fact because EMC is willing to concede $1 in either direction.

[16] Defendants denied that the ledger amount for June 29, 2000 was for $254,799.00 because, when accounting for the debited amount reflected in Pl. Ex. 7, Tab, 86, the ledger amount was actually $251,402.00. (_Id._) However, as the chart set forth in Paragraph 8 of EMC's Statement of Undisputed Facts itself makes clear, EMC only sought recovery of $251,402.00, _i.e._, $145,833.33 in Fixed Fees and $105,568.67 in Percentage Fees. (SOF2 ¶ 8; _see also id._ ¶ 94.) Thus, because EMC already subtracted the debited amount from its requested recovery, Defendants' limited denial is irrelevant and does not create a genuine issue of material fact.

[17] Once these errors are corrected, there is a resulting discrepancy of only 30 cents. However, this difference does not create a genuine issue of material fact because EMC is willing to concede the 30 cents.

## III.    __EMC IS ENTITLED TO INDEMNIFICATION.__

As EMC explained in its opening brief, following this Court's ruling that EMC "established the requirements for indemnification" under the Management Agreements, the only issues that remained were whether the expenses EMC seeks to recover are among those forms of damages delineated in the indemnification provision, and the amount of expenses. (Damages Mem. at 15.) The latter is no longer at issue. Defendants do not contend that any expense was less than EMC has stated; rather, they contest only the scope of the indemnification provision. (Damages Resp. at 23-30.) But while Defendants generally assert that EMC has asked for more than it is due under the indemnification agreement, they ignore the indemnification provision for the most part, and make the straw man argument that EMC seeks to recover payments falling outside the generic rule of contract damages. Because Defendants do not seriously quibble with EMC's interpretation of the indemnification provision, and because the background rules of contract damages do not apply where, as here, parties have specifically contracted otherwise, EMC's motion should be granted.

### A.    __The General Rules For Calculating Contract Damages Do Not Apply.__

The parties did not, as one would think from reviewing Defendants' Response, agree to a generic indemnification provision. Instead, the parties stated in the very Management Agreements at issue exactly what they meant by "indemnification." Defendants agreed to indemnify EMC for:

> any and all losses, claims, liens, encumbrances, charges, obligations, damages, __*liabilities, costs and expenses*__ whatsoever (including without limitation consequential damages, interests, fines, claims for the recovery of response costs, and reasonable attorneys', engineering consultants', accounting, and other necessary professional fees and expenses) . . . incurred or suffered by [EMC] . . . directly or indirectly by reason of, or caused in whole or in part by, __*or pertaining to or in any manner connected with*__ any false statements or breach of any representation, warranty, covenant, term, or agreement of [defendants] contained in this Agreement.

(Damages Mem. at 16; SOF1 ¶ 20 (emphasis added).) Because, as Defendants concede, the provision is unambiguous, the Court must "'give effect to the intention of [the] parties determined solely from the language used.'" (Damages Mem. at 16 (quoting *Shah v. Atlantic Richfield Co.*, 1987 WL 6305, at *4 (N.D. Ill. Feb. 5, 1987)).) However, for no reason that they articulate, Defendants argue that this Court should entirely *ignore* the indemnification provision and apply the "basic theory of damages for breach of contract" – *i.e.*, the background rules that apply when parties do not, as they indisputably did here, contract otherwise. (Damages Resp. at

24

23.)  Specifically, Defendants first argue that EMC is limited to recovering the amount necessary to "remedy[]" the "deficiencies" in the services Defendants' provided.  (*Id*. at 24.)  But in the very next sentence Defendants imprecisely characterize this as EMC's "loss amounts," and on the following page hypothesize that EMC may recover only the "actual economic harm resulting from [Defendants'] breach on the value of the contractually conforming management services." (*Id*. at 24-25; *see also id*. 5-6 ("Edgewater's demand for indemnification must be tied to some actual loss").  This chameleon argument is frivolous.

Defendants provide no basis for ignoring the plain language of the indemnification provision, which permits EMC to recover "any and all losses, claims, liens, encumbrances, charges, obligations, damages, ***liabilities, costs and expenses*** whatsoever."  (Damages Mem. at 16; SOF1 ¶ 20 (emphasis added).)  Defendants' assertion that EMC is limited to the cost of remedying "deficiencies," or "loss amounts," or "actual economic harm" bears no resemblance to the indemnification provision's more fulsome language.  Interpretations of contractual provisions – if Defendants' argument, which refers to the actual language of the contract only in passing can justly be called an "interpretation" – which would render terms superfluous or meaningless are disregarded.  *See, e.g., First Bank & Trust Co. of Ill. v. Vill. of Orland Hills*, 338 Ill. App. 3d 35, 40 (Ill. App. Ct. 2003) ("When parties agree to and insert provisions into their agreement, we presume that this is done purposefully and that the language employed is to be given effect. A court will not interpret an agreement in a way that would nullify its provisions or render them meaningless.") (internal citation omitted.)  Defendants' reading would render meaningless the terms "claims, liens, encumbrances, charges, obligations . . . liabilities, costs and expenses."  Defendants do not – and cannot –  dispute that these terms plainly cover the categories of payments EMC seeks to recover here.

Moreover, none of the cases Defendants rely on even concerns application of an indemnification provision, much less an indemnification provision similar to that quoted above.[18] (Damages Resp. at 23-24.)  Nor do those cases suggest that general damages rules trump explicit

---

[18] The *Avery v. State Farm Mut. Auto. Ins. Co.* and *Nilsson v. NBD Bank of Illinois* courts merely applied the default rules of contract damages Defendants quote; neither purported to do so in the face of and in contradiction to an indemnification clause.  835 N.E.2d 801, 832 (Ill. 2005); 731 N.E.2d 774, 760 (Ill. App. Ct. 1999); Damages Resp. at 23.  Similarly, the Restatement of Contracts section cited by Defendants governs the "measure of damages in general," not indemnification provisions.  Restatement (Second) Contracts § 347.  Finally, that EMC did "not provide this Court with any proof" of damages under the terms of *Kalal v. Goldblatt Brothers, Inc.*, 368 N.E.2d 671, 674 (Ill. App. Ct. 1977), should come as no surprise.  (Damages Resp. at 24.)  That case involved a routine breach of a contract to re-upholster a sofa, and no indemnification clause was at issue.

terms in a contract.  Indeed, parties would never take pains to spell out what forms of recovery are included in indemnification, as the parties here unquestionably did, if general rules of contract damages nevertheless applied. Where, as here, parties spell out the terms of indemnification, those terms must be given effect just like any other terms of the contract.

**B.    EMC Is Not Limited To Losses "Caused" By Defendants Breach.**

Defendants' refusal to consider the actual language of the indemnification agreement at issue is also behind their baseless contention that EMC may recover only those fees whose payment was "caused" by their breach.[19]  (Damages Resp. at 24.)  The indemnification provision requires that to be recoverable those fees need only be "incurred or suffered by [EMC] . . . directly or indirectly by reason of, or caused in whole or in part by, ***or pertaining to or in any manner connected with*** any false statements . . . (Damages Mem. at 16; SOF1 ¶ 20 (emphasis added).)  Defendants read "pertaining to or in any manner connected with" out of the agreement altogether, focusing on the narrowest term.  (Damages Resp. at 24.)  However, as noted above, it is axiomatic that "[i]n construing [a] contract, effect must be given to each clause and word used, without rejecting any words as meaningless or surplusage." *Hufford v. Balk*, 113 Ill. 2d 168, 172 (Ill. 1986).  Giving each term meaning, it is plain that the phrases "pertaining to" and "in any manner connected with" evidence the parties' intention to require indemnification under a much less rigorous standard than actual causation.  Moreover, this Court already has held that EMC "has established the requirements for indemnification." (4/6/05 Mem. Op. at 10.)

As the undisputed facts establish and as this Court found, Defendants' fraudulent and illegal scheme to use EMC to perpetuate Medicare fraud commenced in 1995 and continued until at least the end of 2000.  (4/6/05 Mem. Op. at 4; Damages Mem. at 13.)  During this period, EMC renewed its contracts with Defendants twice, *i.e.*, in 1997 and 2000.  (Damages Mem. at 1.)  It also paid to Defendants at least $22,480,843.82 in fees under those agreements.  (*Id*. at 5.)  The continuance of the 1994 contract for almost three years after the commencement of Defendants' fraud was at the very least in connection with, if not caused by, Defendants' non-disclosure and concealment of their willful breach of certain promises in that agreement, including that they would "perform their obligations as a fiduciary to EMC, . . . perform all their obligations in accordance with applicable laws, . . . use best efforts and due diligence to comply

_____

[19] Defendants' assertion that EMC itself argues that all compensation it seeks was "caused" by the breach is belied both by EMC's Damages Memorandum and the indemnification provision itself, which speak in much broader terms than causation.  (Damages Resp. at 24; Damages Mem. at 17-18.)

with all applicable regulatory entities, and . . . maintain good standing with all licensing and accrediting bodies." (*Id*. at 2.) EMC's renewal of the agreement in 1997 and in 2000 and continued payment of the Defendants' fees was likewise in connection with that same guarantee. Were it not for Defendants' concealment of their willful breach of their promise to operate EMC in accordance with the laws, Defendants would not have been paid a dime under the contract after January 1995, and would not have been awarded the contracts in 1997 and 2000. All fees EMC seeks were therefore "pertaining to or . . . connected with [Defendants] false statements or breach of any representation, warranty, covenant, term, or agreement." (Damages Mem. at 16; SOF1 ¶ 20 (emphasis added).)

Defendants' tired "sky is falling" argument that permitting EMC to recover all management fees paid in connection with Defendants' willful breach and concealment of that breach would "rewrite the law of contractual remedies" is rhetoric without substance. (Damages Resp. at 25.) The argument is entirely contingent upon Defendants' faulty premise that the default rules of contract damages apply. EMC cannot possibly be advocating a change in general contract damages principles where it has made no argument under those principles, but rather has merely asked this Court to apply the terms of the indemnification provision Defendants bargained for. (Damages Resp. at 25.)[20] Defendants having made no attempt to establish the ambiguity of any term in that agreement, and this Court having held them in breach, EMC should recover all that it asked: $22,480,843.82.

**C.    EMC Is Entitled To Recover its Attorneys' Fees and Expenses.**

The indemnification provision listed attorneys' fees and expenses among the types of expenses EMC would be paid upon Defendants' breach. (Damages Mem. at 18.) As EMC demonstrated in its opening brief, this Court need only consider whether the amount EMC requests that it be repaid – $733,892.10 in attorneys' fees and $264,021.02 in expenses – is reasonable in relation to the stakes of the case and Defendants' litigation strategy. (*See* Damages

---

[20] Defendants attempt to bolster their illogical argument with a hypothetical example they felt necessary to defend as neither "absurd nor strained." *Id*. It is both. According to Defendants, they are in the position of an innocent builder who, after contracting to build a house, delivers and is sued for the entire sale price based on nothing more than a leaky faucet. This is plainly not the case. First, as noted above, the evidence demonstrates that EMC entered into two of the Management Agreements after Defendants had already covertly begun using EMC to enact their fraudulent scheme. Second, Defendants' breach of the agreements was far from minor – it drove EMC out of business, effacing the entire purpose of the contracts. Thus, even ignoring the fact that Defendants include no indemnification agreement in their hypothetical, they are more properly akin to a home builder who sells a house with undisclosed, intentional structural flaws, and who signs the sales contract at the very moment he is flooding the basement.

Mem. at 19.)  Just as with all their indemnification arguments, Defendants ignore both the plain language of the agreement as well as the relevant case law.

*First*, Defendants argue in a sentence that EMC cannot recover *any* of its attorneys' fees and expenses because it "has offered no analysis or evidence of the actual loss or harm it sustained."  (Damages Resp. at 27.)  Defendants appear to be relying on their previous erroneous argument that, when determining the amount of *compensation paid to Defendants* EMC can recover, it is limited to its "actual loss."  (Damages Resp. at 23-26.)  This argument is incorrect for the reasons stated above.  Moreover, it is utterly befuddled in this context.  Defendants agreed to indemnify EMC for "any and all losses, . . . obligations, damages, liabilities, costs and expenses whatsoever (***including without limitation . . . reasonable attorneys' . . . fees and expenses***)."  (Damages Mem. at 18 (quoting SOF1 ¶ 20).)  Defendants nowhere explain what the extent of EMC's "actual loss[es]" due to Defendants' breach has to do with whether or not EMC can recover attorneys fees.  Even if one were to accept their argument that EMC is not due all the forms of compensation for services it seeks from Defendants, it does not follow that EMC may not recover *any* of the attorneys fees and expenses it incurred in connection with Defendants' breach.

*Second*, Defendants assert that an award for attorney's fees would be premature "[u]ntil this Court makes a ruling on damages and declares its reasons."  (Damages Resp. at 30.)  Once again, Defendants ignore case law cited in EMC's opening brief holding exactly the opposite.  (Damages Mem. at 18 (citing *Lewis X. Cohen Ins. Trust v. Stern*, 696 N.E.2d 743, 752 (Ill. App. Ct. 1998).)  In *Stern*, defendants similarly argued that the consideration of attorneys' fees under an indemnification agreement was "ill-suited for determination on summary judgment."  696 N.E.2d at 233.  That court rejected the argument, reasoning that where a court has before it adequate evidence of the fees, as this Court does, the fact that defendants "simply question[] the reasonableness of the fees does not create a factual dispute sufficient to preclude summary judgment."  *Id*.  Moreover, Defendants nowhere explain what efficiency there is to be gained by this Court first rendering a decision on all other issues raised in EMC's Damages Motion, and then separately taking up attorneys fees at a later date.  Defendants have raised no issue of material fact making summary judgment as to fees and expenses inappropriate, and the Court has all the evidence needed for decision.

*Finally*, Defendants argue that the amount of fees and expenses sought is unreasonable. (Damages Resp. at 28-29.)  In stark contrast to what Defendants characterize as EMC's "pages of dense citation and case law" offered to "justify the reasonableness of its fees," Defendants do not cite a single case, instead once again embarking on their own free-wheeling analysis.  (*Id.* at 28.)  As EMC demonstrated in its opening brief, it is firmly established that where a contract, as opposed to a fee-shifting statute, provides for the repayment of attorneys' fees and expenses, a court need not perform an item-by-item review.  (Damages Mem. at 19); *see also Berthold Types Ltd. v. Adobe Sys.*, *Inc.* 186 F. Supp. 2d 834, 837 (N.D. Ill. 2002) (following *Medcom Holding Co. v. Baxter Travenol Labs.*, Inc., 200 F.3d 518, 521 (7th Cir. 1999), in holding that it need not engage in "'a detailed, hour-by-hour review'" of attorneys' fees requested under a contractual fee-shifting provision ).  However, Defendants' nevertheless challenge the reasonableness of fees paid for research on "arbitration clauses," contending that no such issues were raised.  (Damages Resp. at 29.)  Even if this Court were to consider line-item challenges, and it clearly need not, this one misses its mark.  Research on the potential that Defendants would seek to arbitrate this case was necessitated by nothing less than explicit arbitration clauses in all three Management Agreements, which purported to be triggered by a party's denial of default.  (*See* August 17, 1994 Hospital Management Agreement at ¶ 7.01 (b) [Pl. Ex. 1] (providing that where a party denies it is in default of the agreement, "the parties do hereby covenant and agree to submit such matter to binding arbitration"); August 1, 1997 Amended and Restated Hospital Management Agreement at ¶ 7.01 [Pl. Ex. 2] (same); March 1, 2000 Hospital Management Agreement at ¶ 7.01 [Pl. Ex. 3] (same).)

EMC further showed that the Seventh Circuit has repeatedly confirmed that the best indication of the reasonableness of attorneys' fees and expenses is a client's payment of those fees previous to resolution of the dispute.  (Damages Mem. at 19-21.)  While Defendants admit that the fees at issue have been paid by Dexia, they ignore the multitude of cases standing for this proposition, which the Seventh Circuit has recently reaffirmed.  *See TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 593 (7th Cir. 2005) ("We also note that 'courts award fees at the market rate, and the best evidence of the market value of legal services is what people pay for it.  Indeed, this is not 'evidence' about market value; it *is* market value.'") (quoting *Balcor Real Estate Holdings v. Walentas-Phoenix Corp.*, 73 F.3d 150, 153 (7th Cir. 1996)).  Rather than discuss the applicable law, Defendants make the counterintuitive argument that because Sidley Austin LLP

29

represents Dexia in other matters related to Defendants' fraud, its payment of Sidley Austin's bills should not create the normal strong inference that those bills are reasonable. This is a distinction without a difference. From the outset, Dexia's only opportunity to recover attorneys fees under the Funding Agreement with EMC has been to prevail in the present case. Motion of Debtor for Authority to Enter into Agreement for Post-Petition Funding, *In re Edgewater Medical Center*, No. 02-07378 (Bankr. N.D. Ill. May 23, 2003) (Entry 498); Order Authorizing the Debtor to Enter into Agreement for Post-Petition Funding, No. 02-07378 (Bankr. N.D. Ill. June 25, 2003) (Entry 524). Because Defendants have hotly contested the litigation at every turn, Dexia has had ample incentive to keep fees low. *See, e.g.*, *Medcom*, 200 F.3d at 521 ("One indicator of reasonableness [of attorneys' fees] is that [the client] paid all of these bills at a time when its ultimate recovery was uncertain.); *see also Knoll Pharm. Co. v. Auto. Ins. Co. of Hartford*, 210 F. Supp. 2d 1017, 1024 (N.D. Ill. 2002) (same).

Notably, Defendants appropriately decline to argue that the roughly $1 million in fees and expenses EMC incurred in connection with Defendants' breach of the agreements is unreasonable in relation to the stakes in this case, which top $37 million. Nor do Defendants argue that the fees submitted are insufficiently detailed, or even that their own fees were much lower. Instead, they contend that the fees are unreasonable insofar as they were paid for discovery costs which went beyond what Defendants consider to be "essential or reasonable in terms of prosecuting this adversary proceeding." (Damages Resp. at 28; *see also id*. at 29 (challenging fees paid in connection with third-party discovery). This argument fails for two reasons. *First*, it impermissibly relies on hindsight. *See, e.g., Boss v. Commonwealth Edison Co.*, 1995 U.S. Dist. LEXIS 13798, at *4 (N.D. Ill. Sept. 20, 1995) ("[T]he reasonableness of attorneys' fees should not be determined on the basis of hindsight vision. Instead, the proper way to determine reasonable fees is to determine whether or not the actions were reasonable at the time they were taken."). EMC could not have known from the outset exactly what quantum of evidence would be necessary to secure judgment, or what stage – summary judgment or after trial – the case would be resolved at. Moreover, EMC's discovery has quite reasonably ranged beyond matters covered by the current and prior motions for *partial* summary judgment because, as that appellation implies, EMC has numerous other claims remaining. Indeed, EMC's Complaint contains twelve distinct counts. As Defendants have not gained dismissal of a single

count, EMC has been entitled to take discovery relating to all of them, not just the three presently under consideration.

*Second*, the cramped argument that EMC should be able to recover only those attorneys' fees spent on prosecution of its present claims against the Management Companies ignores the sweeping language of the indemnification provision.  That provision does not limit the recovery of fees to the prevailing party in actions against a breaching party; instead, it allows recovery of all attorney's fees and expenses  *"pertaining to or in any manner connected with any false statements or breach of any representation, warranty, covenant, term, or agreement of [Defendants] contained in this Agreement."* [21]  The discovery Defendants obliquely refer to, including that against Fred Cuppy (a Rogan lawyer and former Finance Committee member of EMC's former parent), John Tatooles (a Rogan, Braddock L.P., Bainbridge L.P., and EMC lawyer), the Baudino Law Firm (a former EMC lawyer hired, *inter alia,* to access the reasonableness of Defendants' management fees), Permian (EMC's parent from August 1994 – 1998), and EMC's former directors was "connected" to Defendants' breach of the Management Agreements.  (Damages Resp. at 29.)  It arises from EMC's investigation into the players at EMC during the fraud period and the persons who worked on behalf of the fraudfeasors (Braddock L.P. and Bainbridge L.P.) and their principal, Peter Rogan.  Because Defendants do not and cannot contend that fees submitted by EMC relating to third-party discovery were not incurred "in any manner connected with" the fraudulent scheme Defendants pursued in breach of the Management Agreements, the argument fails.

> **D.**   **Edgewater Is Entitled To Prejudgment Interest.**

In addition to attorneys' fees and expenses, the indemnification provision also specifically requires Defendants to pay EMC interest.  (Damages Mem. at 22.)  Defendants do not contest this obligation, but instead only repeat their argument that EMC requests repayment of fees it paid Defendants which go beyond "the amount necessary to compensate plaintiff for the harm or loss it has sustained."  (Damages Resp. at 26.)  As demonstrated above, pp. 23-27, *supra*, this argument requires one to ignore the indemnification provision itself and apply the background rules of contract damages.  Because the indemnification provision encompasses the

---

[21] That the attorneys fees referred to in this provision go far beyond what is necessary to enforce the agreement is evidenced by the fact that the contracts contain a *separate* provision just for enforcement: "should any action be brought to enforce this Agreement, the prevailing party shall be entitled to its attorney's fees and costs."  (*See, e.g.*, August 1, 1997 Amended and Restated Hospital Management Agreement ¶ 9.17 [Pl. Ex. 2].)

types of compensation that EMC requests, it should also be awarded $14,156,736.48 in prejudgment interest.  (Damages Mem. at 23.)[22]

## IV.   SUMMARY JUDGMENT SHOULD BE ENTERED AGAINST BRADDOCK L.P. FOR THE ADDITIONAL REASON THAT IT FAILED TO RESPOND TO EMC'S MOTION.

Despite the fact that (i) EMC obtained a judgment on liability against Defendants Braddock L.P., Bainbridge L.P., and Bainbridge Inc. and that (ii) EMC filed its present summary judgment motion against all three Defendants, only Bainbridge Inc. filed a response in opposition to EMC's current motion.  (Damages Resp. at 1.)  Defendants' response, which is explicitly filed only in the name of Bainbridge Inc., asserts that Braddock L.P. did not file a response to EMC's summary judgment motion because it was "dissolved by the California Secretary of State" on November 1, 2004, and therefore "no longer exists."  (*Id.*)[23]  However, that assertion does not relieve Braddock L.P. of its obligation to respond.

### A.      Braddock Was Obligated to Respond to EMC's Summary Judgment Motion.

To begin with, Defendants provide absolutely no evidence to establish that Braddock L.P. actually was dissolved by the California Secretary of State.  It is not enough on summary judgment for Defendants to merely assert that Braddock L.P. was dissolved; rather, Braddock L.P. was required to provide the Court with admissible evidence of its dissolution.  *See* Fed. R. Civ. P. 56(e); *Michael v. St. Joseph County*, 259 F.3d 842, 845 (7th Cir. 2001) (the nonmoving party must respond to a summary judgment motion with admissible evidence setting forth specific facts showing that there is a genuine issue for trial).[24]

Furthermore, even if Braddock L.P. had presented evidence of its dissolution – which it did not – Braddock L.P. still would not be relieved of its obligation to respond to EMC's motion because a dissolved limited partnership may be held liable for its pre-dissolution activities.  *See*

---

[22] Defendants concede that the applicable interest rate is 7.0615%.  (Damages Mem. at 23; Damages Resp. at 26-27.)

[23] Defendants' response also states that Bainbridge L.P. did not file a response because it filed for bankruptcy protection under Chapter 7 on September 28, 2005.  (*Id.*)

[24] Also, according to Defendants' response, Braddock L.P. was dissolved on November 1, 2004.  (Damages Resp. at 1.)  Since that time, Braddock L.P. has filed numerous pleadings in this adversary proceeding (as well as the *Dexia* litigation pending in the District Court), including several motions seeking an extension of time in which to respond to EMC's current motion.  (*See, e.g.,* Court's Docket at 94, 99, 100.)  By actively participating in this litigation for nearly a year after it was purportedly dissolved, Braddock L.P. has waived any argument that it is under no obligation to do so now as a result of its dissolution.  *C.f. Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir. 1993) (defendants waived argument that court lacked personal jurisdiction where they had participated in litigation of the merits); *Cabinetree of Wisconsin, Inc. v. Kraftmaid Cabinetry*, 50 F.3d 388, 390 (7th Cir. 1995) (proceeding with litigation in court serves as presumptive waiver of right to arbitrate).

*Peñasquitos, Inc. v. Superior Ct.*, 53 Cal. 3d 1180, 1184-94 (Cal. 1991) (holding that a dissolved corporation may be sued and held liable for its pre-dissolution activities, because dissolution prevents the corporation from "doing business as a going concern" and defending a claim is part of the termination process rather than an attempt to do business as a going concern); *Robert L. Rentto Prof'l Law Corp. v. Four Seasons No. 1500, LTD*, 2005 WL 2767186, at *3 (Cal. Ct. App. Oct. 26, 2005) (extending the principle of *Peñasquitos* to dissolved limited partnerships).

B.       **By Failing to Respond to EMC's Motion, Braddock L.P. Has Effectively Admitted that There Are No Genuine Issues of Material Fact Preventing Summary Judgment.**

By failing to timely respond to EMC's motion for summary judgment, Braddock L.P. has waived its right to respond and has admitted that there are no genuine issues of material fact preventing judgment in EMC's favor. *See United States v. Kasuboski*, 834 F.2d 1345, 1351 (7th Cir. 1987) ("The defendants, by failing to timely file a resistance or to receive an extension, waived their right to respond to the government's motion for summary judgment."); *Flynn v. Sandahl*, 58 F.3d 283, 288 (7th Cir. 1995) (effect of failing to respond to motion for summary judgment is that "it constitutes an admission by the non-movant that there are no disputed issues of genuine fact warranting a trial"); *Grant v. Coken Co.*, 2004 U.S. Dist. LEXIS 18421, at *6 (N.D. Ill. Sept. 14, 2004) ("[W]hen a party fails to respond to a motion for summary judgment, as in this case, its failure constitutes the admission that there are no genuine issues of material fact warranting a trial.")

C.       **Alternatively, At a Minimum, Braddock L.P. Is Bound to the Same Extent as Its General Partner, Bainbridge Inc.**

While Defendants' response explicitly is filed only in the name of Bainbridge Inc., Defendants make the cryptic assertion that, because "Bainbridge Inc. was Braddock L.P.'s general partner," Bainbridge Inc. "will speak to Edgewater's Motion to the extent that it seeks relief from Braddock L.P." (Damages Resp. at 1.) Defendants are merely playing word games. While the meaning of this statement is unclear, it appears that Defendants are trying to create a loophole by expressly filing the response only in Bainbridge Inc.'s name, but then hedging their bets by vaguely asserting that Bainbridge Inc. will "speak" to the motion on Braddock L.P.'s behalf. That attempt should be rejected. Defendants cite no authority for the proposition that where, as here, a limited partnership and its general partner are both named as defendants, the limited partnership is under no obligation to respond to a motion for summary judgment because

the general partner can "speak" to the motion.  As such, the Court should construe Braddock L.P.'s failure to respond as a tacit admission that there are no genuine issues of material fact. However, if the Court accepts Defendants' cryptic assertion, then, at a minimum, the Court should hold Braddock L.P. liable to the same extent as its general partner, Bainbridge Inc.[25]

## **CONCLUSION**

For the reasons set forth herein and in EMC's opening brief, EMC respectfully requests that this Court grant its Motion for Partial Summary Judgment.

Respectfully submitted,

Dated:  January 9, 2006

EDGEWATER MEDICAL CENTER
Debtor/Plaintiff

By:   /s/ Eric J. Pearson
       One of its attorneys

Eugene Crane
Arthur G. Simon
CRANE, HEYMAN, SIMON,
WELCH & CLAR
135 South LaSalle Street, Suite 3705
Chicago, Illinois 60603

Scott Mendeloff
Gabriel Aizenberg
Tara K. Charnes
Eric J. Pearson
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603

*Counsel to the Debtor/Plaintiff Edgewater Medical Center*

*Special Counsel to the Debtor/Plaintiff Edgewater Medical Center*

---

[25] Also, by purporting to "speak" on behalf of Braddock L.P., Bainbridge Inc. has acknowledged its liability for that entity.  (Damages Resp. at 1.)  As this Court already has held, "Bainbridge Inc., as the general partner of both Bainbridge L.P. and Braddock, is fully liable to EMC as a matter of law."  (4/6/05 Mem. Op.)

## <u>CERTIFICATE OF SERVICE</u>

I, Eric J. Pearson, an attorney, do hereby certify that on this 9th day of January 2006, I caused a true and correct copy of the foregoing **Plaintiff Edgewater Medical Center's Reply Memorandum in Further Support of its Motion for Partial Summary Judgment on Forfeiture of Compensation, Attorneys' Fees and Prejudgment Interest** to be served by electronic mail upon the attorneys listed below.

/s/ Eric J. Pearson
Eric J. Pearson

Phillip S. Reed
Debra Bogo-Ernst
Sean P. Dailey
Diane R. Sabol
MAYER, BROWN, ROWE & MAW LLP
190 South LaSalle Street
Chicago, Illinois  60603
(312) 782-0600
(312) 701-7711 (facsimile)

Howard Pearl
Neil Holmen
Joseph A. Spiegler
Neil Murphy
Chris Stathopolous
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
(312) 558-7422
(312) 558-5700 (facsimile)

*Counsel for Defendants Braddock Management, L.P. and Bainbridge Management, Inc.*

*Counsel for Peter G. Rogan*

CH1 3417197v.1